Per Curiam :
These are suits by inspectors of the Border Patrol of the Immigration and Naturalization Service (and designated immigration patrol inspectors of that Service) for overtime pay alleged to be owing to them under the federal overtime pay legislation. The cases were referred to trial commissioner W. Ney Evans, pursuant to Buie 45 (a), for findings of fact and a recommendation for a conclusion of law. The commissioner has filed a report containing an opinion, proposed findings of fact, and a recommended conclusion of law. Each side has excepted to portions of the commissioner’s opinion, of the propose,d findings, and of the recommended conclusion. Briefs have been filed and oral argument has been had.
With certain modifications, the court adopts the commissioner’s findings as its own.
A. The first part of the plaintiffs’ claims involves the period before April 24, 1955 — the date when they began to receive premium pay under Section 208(a) of the Federal Employees Pay Act Amendments of 1954, 68 Stat. 1111, as amended, 5 U.S.C. § 926 (1958). As to that earlier period, Commissioner Evans recommends, on the basis of the findings, that the court hold the plaintiffs entitled to recover for irregular, unscheduled overtime performed by them. With the explicit qualification that no plaintiff is entitled to recover for any period prior to six years before the filing of the petition in his case (28 U.S.C. § 2501) ,[1] we accept that conclusion. The court does not adopt the commissioner’s opinion in all of its aspects and statements, but the court does agree that these cases are controlled in principle by Anderson v. United States, 136 Ct. Cl 365 (1956):
First, in the sense explained by Anderson, there was inducement of the plaintiffs by the Immigration and Naturalization Service to perform overtime under the Federal Employees Pay Act of 1945, 59 Stat. 295.
Second, the various Commissioners of Immigration and *769 Naturalization (in the period prior to April 24,1955) knew and approved of this overtime, and in effect authorized it. As in Anderson, written authorization or approval by the Commissioner of Immigration and Naturalization was withheld as a matter of policy.
Third, plaintiffs are not prevented from recovering because their superior and the head of their agency, the Commissioner of Immigration and Naturalization, withheld issuance of written orders (or approval) which should have been issued in the circumstances. Neither the Federal Employees Pay Act of 1945, nor Executive Order No. 9578, nor 31 TJ.S.C. ■§ 665, nor 31 U.S.C. § 627 barred federal employees from recovering overtime under the Federal Employees Pay Act for overtime work where the head of the agency (or the major entity of the Department concerned) in fact ordered, approved, or authorized the work but would not put his order, approval, or authorization in writing.[2]
Foivrth, plaintiffs are not precluded from recovering for the period prior to April 24, 1955, because of the circumstance that during the only portion of that time which is free from the limitations bar (i.e., subsequent to February 11, 1953) the Attorney General had directed in writing that all paid overtime for employees of the Department of Justice had to be ordered by the head of the division or office (in this case, the Commissioner of Immigration and Naturalization) and approved in advance by the Deputy Attorney General or the Administrative Assistant Attorney General. There is no proof that either of these latter two officials ever approved in advance the overtime for which compensation is now sought, but we hold that, in the circumstances presented here, this requirement was invalid and therefore need not be followed. The record and the findings show that these plaintiffs had to work overtime in order to complete their assignments of inspection, interrogation, surveillance, and investigation at various points on or near the borders of the United States. Sometimes these assignments were of an emergency nature, obviously not permitting of advance ap *770 proval by a high official in Washington. Even where there was no unforeseeable emergency, the work was of such a character and the need for overtime so irregular but recurrent that it would normally be impossible or overly difficult to obtain advance approval from the Washington officials for each specific overtime period to be worked by the border patrol inspectors of the Service throughout the country.[3] With respect to such employees and work of this type, it was unreasonable for the Department of Justice to centralize in two high departmental (but non-Service) officials at the seat of Government the advance approval of any overtime work by these scattered border patrolmen, and to require that, before any overtime compensation could be paid them, the prior authorization of either of these two officers had to be obtained. The Federal Employees Pay Act of 1945, supra, 59 Stat. 295, and Executive Order No. 9578 did not empower the Attorney General, with respect to. the circumstances now before us, to impose such an unreasonable limitation on the authorization of overtime pay. Accordingly, that part of the Attorney General’s order being invalid as applied to the plaintiffs, the implicit authorization we find to have been given by the Commissioner of Immigration and Naturalization was sufficient under the Pay Act and the Executive Order.
B. The second part of these cases involves the period subsequent to April 24,1955. The plaintiffs claim that the savings clause of the Federal Employees Pay Act Amendments of 1954 (i.e., Section 208(b) of the 1954 Act, 68 Stat. 1111, 5 U.S.C. § 926 (footnote) ) (see finding 13(a)) entitles them to continue to receive no less than the lawful “existing aggregate rate of compensation” on or before September 1, 1954 (the date of the 1954 Amendments) or on or before April 23,1955 (the day before the date when premium pay was given to plaintiffs) — including the overtime compensation which they should have been, but were not actually, paid during that prior period. The trial commissioner has recommended, as to this part of the cases, that the plaintiffs are not entitled to recover for overtime performed on and after April 24, 1955. *771 We agree with, that conclusion and with, the commissioner’s opinion on that issue (Part IY of the opinion). Though presented with the opportunity at the trial on the issues of liability, plaintiffs did not prove, as they should have done, that the “aggregate rate of compensation” which was, and was required to be, paid them on or before September 1,1954 (or on or before April 23,1955) was in fact higher than the pay they received on and after April 24,1955. In addition, we believe that Section 208 (b), in referring to “existing aggregate rate of compensation of any present employee” means simply the actual pay (or actual rate of pay) then being paid to the employee, not the pay which he would have received if his superiors had interpreted the Federal Employees Pay Act of 1945 as we now do. See Bean v. United States, 146 Ct. Cl. 267, 270-272, 175 F. Supp. 166, 168-69 (1959). When Congress enacted the provisions of the 1954 Act permitting premium pay, it intended that solution to the problem of hitherto unpaid “irregular, unscheduled overtime”, or so-called “voluntary overtime”, to wipe the slate clean and to stand in the place of the various unresolved claims and counterarguments which had been made under the 1945 Act. Congress did not intend the executive and the courts, in administering and enforcing the new premium pay provision, to have to look back to unacknowledged claims under the 1945 statute and to keep those controversies alive until they were finally settled judicially. The savings clause made sure that actual pay (or rate of pay) being received prior to the effective date of the premium pay provisions was not to be reduced by the new system, but Congress did not go beyond that line to cover pay which should have been paid but was not because the employing agency disputed the employee’s right or because the employee had not yet put in his claim. Plaintiffs’ position would keep these pre-1954 contentions boiling for many years.
Accordingly, plaintiffs (except those listed in finding 14 (b) and (c)) are entitled to recover on their claims for irregular, unscheduled overtime work prior to April 24,1955 (but within six years of the respective plaintiff’s petition), but are not entitled to recover for such overtime work performed on and after that date. Judgment is entered to that effect. Unless the parties can stipulate the amount of re *772 covery in each instance, that amount will have to be determined in further proceedings under Rule 88 (c).
OPINION OP COMMISSIONER
I
Prior to World War II there was no general provision for the payment of additional compensation to civilian employees of the United States for overtime work. On the contrary, the Act of March 3, 1893,[4] as amended,[5] directed the heads of departments “* * * to require of all * * * employees * * * not less than seven hours of labor each day, except Sundays and * * * holidays,” and provided that such hours might, by special order, be extended, and that “in case of an extension it shall be without additional compensation * *
The standard (minimum of 7 hours per day, 6 days per week) resulted in a workweek of 42 hours, which was reduced to 39 hours (7 hours each day, Monday through Friday, and 4 hours on Saturday) by the Saturday half-holiday law of 1931.[6]
Hours in excess of the minimum standard were prescribed for many employees. The payment of additional compensation for such excess hours was exceptional, and was made only under specific authority.[7]
*773 The 40-hour week first gained wide acceptance in the United States as a result of industry codes adopted under the National Industrial Recovery Act of 1933. During the remainder of the 1930’s, the 5-day, 40-hour week became the established pattern in many industries, and was extensively used in collective bargaining agreements, many of which provided for the payment of overtime for work in excess of established hours.
Beginning in 1940, the national defense effort made it necessary for one Government agency or department after another to conform, in part at least, to the working hours and pay standards of industry, in the administration of defense contracts.[8]
This need was intensified and the trend accelerated after the United States entered the war in December 1941.
The suspension of the Saturday half-holiday was begun in 1940,[9] and was renewed and extended in 1942[10] and 1943.[11]
The Joint Resolution of December 22, 1942,[12] extended “* * * the authorization contained herein to pay overtime compensation * * * to all civilian employees in or under the United States Government * * subject to exceptions not here material. This authorization, limited to April 30, 1943, was extended by the Act of May 7, 1943,[13] to expire on June 30,1945.
Pursuant to the statutes cited in the preceding paragraph, and to Executive orders and regulations, the standard wartime workweek in the Federal service became 48 hours, composed of a basic workweek of 40 hours and 8 hours of overtime (for which employees were compensated) to make an administrative workweek of 48 hours.
*774 Just as the authorization of the Joint Eesolution of December 22, 1942, would have expired if it had not been extended, so the extended and expanded authorization of the Act of May 7, 1943, would have expired on June 30, 1945, had it not been for the Federal Employees Pay Act of 1945,[14] which was approved on June 30, and by its terms made effective on July 1,1945.[15]
The Federal Employees Pay Act of 1945 repealed the laws relating to the 7-hour, 6-day workweek and the Saturday half-holiday. The statute was, according' to its title, “An Act to improve salary and wage administration in the Federal service; to provide pay for overtime and for night and holiday work; * * * to bring about a reduction in Federal personnel and to establish personnel ceilings for Federal departments and agencies; * * *.”
The legislation was considered and adopted after the defeat of Germany but before the surrender of Japan. While provision was made accordingly for maintenance of the standards and methods in use during the prosecution of the war, the statute looked beyond and set forth standards to be applied “upon the cessation of hostilities in the present war.”
The Act (1) increased the rates of 'basic compensation provided by the Classification Act of 1923; (2) established a basic administrative workweek of 40 hours (to be performed within a period of not more than 6 of any 7 consecutive days) ; (3) directed that additional compensation be paid “for all hours of employment, officially ordered or approved, in excess of forty hours in any administrative workweek” at specified overtime rates;[16] (4) authorized compensatory time off duty in lieu of overtime compensation for irregular or occasional overtime work;[17] (5) ordered *775 payment of a 10 percent differential for night work (between 6 p.m. and 6 a.m.) ; (6) specified time and one-half for work on holidays (effective “upon the cessation of hostilities in the present war”); and (7) ordered a quarterly review of the employment needs of departments and agencies “for the purpose of determining the numbers of * * * civilian employees * * * required * * * for the proper and efficient performance of * * * authorized functions * *
On July 4,1945, Executive Order 9578[18] directed the heads of departments to establish, with respect to each group of full-time employees, (1) a regularly scheduled basic workweek of 40 hours and a regularly scheduled administrative workweek consisting of the 40-hour basic workweek plus such period of overtime work as will be regularly required. The order further specified that all affected employees should be paid overtime compensation for all hours of employment officially ordered or approved in excess of 40 hours in any administrative workweek, including irregular or occasional overtime duty; and authorized heads of departments to delegate “to any officer or employee” authority to order or approve overtime, provided that: “No overtime in excess of the administrative workweek shall be ordered or approved except in writing by an officer or employee to whom such authority has been specifically delegated * *
The new pay act was fraught with many problems of administration other than the payment of additional compensation for overtime work and as night differentials. Every administrative office had to adjust to biweekly payrolls, revise schedules of work that had to be done every day and at night, and adapt to the new requirements relating to allowances of leave (sick and annual) .[19]
II
Beginning in 1951, several actions were filed in this court by former inspectors of the Customs Patrol Service[20] to *776 recover overtime pay under the provisions of the Federal Employees Pay Act of 1945 for overtime worked by them in the performance of irregular, unscheduled duty, although such overtime had not been “ordered or approved * * * in writing by an officer or employee to whom * * * authority has been specifically delegated by the head of the department.”
In ordering judgment for the customs patrol inspectors the court said:[21]
* * * The evidence indicates that the work of the Customs Patrol was not the kind of work which could be easily accommodated to a 5-day, 40-hour week. The detection and pursuit of smugglers could not be stopped at 5:00 o’clock and resumed at 8:00 the next morning. It may be that Congress would have been well advised to omit such employees from the Overtime Pay Act of 1945, or to make some different arrangement for their compensation. But Congress did not omit them, and their superiors were not authorized to deny to them the benefits of the act, on the ground that the administration of the act would be difficult, almost to the point of impossibility, or that money had not been provided to pay the employees what they were entitled to under the law. * * *
Plaintiffs in the present actions are immigration patrol inspectors of the Border Patrol of the Immigration and Naturalization Service. Their claims are founded on the contention that the pursuit of aliens seeking illegal entry into the United States could not be stopped at 5 o’clock and resumed at 8 the next morning, wherefore they, too, worked irregular and unscheduled overtime for which they should now be paid.
During the period covered by these suits[22] the Immigration and Naturalization Service was part of the Department
*777 of Justice.[23] The line of administrative authority ran from the Attorney General to the Commissioner of Immigration and Naturalization, and from him through various subordinates to the Border Patrol.
The parties to the present actions have stipulated that:
Because of the nature of the law enforcement work of the Border Patrol, emergencies arose which caused work to be performed beyond normal hours. The officer was responsible for ascertaining the need for emergency services. For example, pursuit and apprehension of an alien who had entered illegally often could not be completed within an officer’s shift. Many of the officers worked extra hours whenever in their opinion the need existed for additional work to accomplish the task.
It is clear from the foregoing that plaintiffs in these cases performed some overtime of the kind that was involved in the customs cases.[24]
On the basis of the evidence adduced at the trial of the customs cases, the customs patrol inspectors contended that they had been “required” to work the overtime hours, wherefore the overtime was authorized and approved within the meaning of the statute. The Government contended that the overtime work was done voluntarily, wherefore it was neither authorized nor approved within the meaning of the *778 statute and tlie regulations, particularly since tbe administrative officers (district superintendents and tbeir subordinates) lacked authority either to authorize or to approve it.
The court’s ‘finding, in the customs cases, was that the customs patrol inspectors “were induced to perform the overtime by the district superintendents and their subordinate officers, and that in providing such inducement the district superintendents acted under the leadership and upon the specific suggestion of the Commissioner of Customs.” [25]
The Government contends, in the instant cases, that the immigration inspectors were not induced to perform the overtime by superior administrative officers.
On this point the Government’s contention fails, on the facts. Following is a portion of the text of the crucial finding:
12. (a) The completion of assignments, as the measure of a good patrolman, was a tradition in the Service long before the 1945 Pay Act was adopted. Before and during World War II, patrolmen put in extra time (beyond the hours for which they were compensated) when in their judgment such overtime was required to accomplish their tasks.
(b) Before the 1945 Pay Act was adopted, the patrolmen had no reason to hope for additional pay for extra hours worked. After the Act they realized that additional pay for overtime had to be withheld only because of administrative and budgetary problems in the Service. As a consequence of the 1945 Pay Act the Service found it necessary to emphasize the importance to it of completion of assignments by the patrolmen to offset the understandable dissatisfaction of the patrolmen resulting from the deprivation of overtime pay for overtime hours.
(c) Since the end of World War II each trainee for a patrolman’s position has served one year on probation as an apprentice. Some of this time was spent in training school, but most of it was spent on duty in the field under the tutelage of a succession of journeymen patrolmen. Each journeyman impressed upon trainees under his supervision the importance of completing an assignment. Time was not to be considered. If the task required more than 8 hours per day or 40 hours per week, it had to be completed nevertheless. The trainees *779 learned, quite incidentally, that extra hours spent in completion of an assignment would not be paid for. The training was so thorough that, by the time an apprentice became a journeyman, the importance to the Service (and to his own hopes for advancement) of completing the task was part of his mental habit.
As stated in a footnote to the foregoing finding:
The evidence as a whole warrants the conclusion that the completion-of-assignments concept was burnished by the Service to assure performance of “voluntary” overtime, and that the burnishing was as subtle as it was effective. The aim of the Service was accomplished so smoothly that the duality of purpose of the training system was never apparent.
Clearly, there was as much inducement of overtime by the Immigration Service as there was by the Customs Service. As noted in the Anderson opinion, “* * * the Commissioner and his subordinates rationalized the concept of voluntary overtime into the course of conduct by which the patrol inspectors were induced to perform the overtime work. Under the circumstances, their action resulted in subterfuge, albeit subconscious. * * *” The only difference between the Services in terms of inducement is that Immigration was subtle whereas Customs was audacious.
The Government further contends, in the instant cases, that there was no inducement chargeable to the leadership or specific suggestion of the official or officials who could have authorized or approved such overtime.
At the trial of these actions Mr. Ugo Carusi, who was Commissioner of Immigration and Naturalization in August 1945, and who was therefore responsible for the Service’s initial adaptation to the 1945 Pay Act, testified as follows:[26]
* * * What we had in mind was the fact that the law came into effect which authorized paid overtime or compensatory time off, and we were not in the fiscal position of doing the former, that is, paying the overtime, and so we sought to alert the patrolmen that that was the situation. They could not expect as a general matter to be paid for overtime that they might perform.
*780 We reached this conclusion: * * * that if as a result of our inability to pay the overtime no overtime was performed, our work objectives and the quantity and quality of our work would drop to a point that we would prefer not to have to do it.
The evidence warrants the inference that succeeding Commissioners of Immigration shared the desire and adopted the methods of Mr. Carusi to maintain the standards of the Service.
The fact that the Commissioner of Immigration knew and approved of “voluntary” overtime by the border patrolmen is not a complete answer to defendant’s contention, however. During the period extending from January 27, 1953, to June 1, 1955, the Commissioner of Immigration lacked authority to authorize or approve overtime in writing. That authority resided only in the Deputy Attorney General and the Administrative Assistant Attorney General and, except for this fact, there is no evidence relating to either of these officials.
Plaintiffs’ claims are for irregular, unscheduled overtime (1) for the periods backdated 6 years from the filing of their several petitions (the earliest date being February 11, 1953) to April 24, 1955, and (2) from April 24, 1955, to the date of judgment. The significance of the cutoff date is noted below. Considering only the claims prior to the cutoff date, it is not affirmatively shown by the evidence that the irregular overtime induced by the Service was performed with the knowledge and consent of an official to whom there had been delegated the authority to authorize or approve overtime in writing.
The opinion in Anderson contained the following observations :
* * * The statutory compensation for overtime services performed with the knowledge and approval of the Commissioner of Customs is * * * due to the patrol inspectors unless payment must be denied because the Commissioner and his subordinates meticulously eschewed putting any order for or approval of such overtime in writing.
The writing was required by the regulations, not by the statute.
*781 * * * The withholding of written orders or approval reflected observance of the letter of the regulation but denial of the substance of the statute.
* * * Under the circumstances, the mandate to pay additional compensation for overtime hours, when the work was, as here, officially ordered or approved, is overriding. * * *
In the instant cases there is a hiatus in the proof that the overtime services were performed with the knowledge and approval of officials having authority to authorize or approve it in writing. This gap in the proof is, however, a technicality only. As such it is not controlling. The evidence makes it abundantly clear that the Service, as an entity, induced the overtime, and that the withholding of written authorization or approval was done overtly and as a matter of departmental policy.
The plaintiffs are entitled to recover for irregular overtime performed prior to April 24,1955, unless, as defendant further contends, the Anderson conclusion that the mandate of the statute overrides the lack of written authorization or approval is inapplicable here.
Ill
Defendant, in a brief submitted to the trial commissioner, challenges the validity of the Anderson holding as applied to these cases, the contention being that no official of the Department of Justice (the Attorney General, the Deputy Attorney General, the Administrative Assistant Attorney General, or the Commissioner of Immigration) had authority to authorize or approve the overtime services of the patrolmen in any manner other than in writing, as prescribed by Executive Order 9578.
The supporting argument has two prongs: (1) that the officials of the Department of Justice, as subordinate officials of the executive branch, receiving their authority from and acting for the President, could not confer any rights upon these plaintiffs if their action was not in conformity with law; and (2) that these officials were precluded, by specific *782 statutory provision,[27] (a) from accepting voluntary service for tlie United States and (b) from employing personal services in excess of that authorized by law.
Defendant’s brief advances the further proposition that before plaintiffs could be paid anything for overtime services, an appropriation act would be necessary.[28]
Defendant has cited authorities in support of its propositions, as generalizations. Instead of a marshaling of cases showing (1) the proper applications (and limitations) of such generalizations and (2) the exceptions thereto and departures therefrom in particular fact situations, perspective will be better served by a resume of the practical problem in hand.
The Federal Employees Pay Act of 1945 applied the requirement of overtime pay across the board. As noted by this court in Anderson: “It may be that Congress would have been well advised to omit such employees [as patrol inspectors and others hereinafter noted] from the * * * Act * * * or to make some different arrangement for their compensation. But Congress did not omit them * *
Immediately upon the passage of the Act, four agencies in two departments found themselves in a serious administrative quandary. These were the border patrols (of the Customs Service in Treasury and of the Immigration Service in Justice) and the criminal investigation units (of narcotics in Treasury and the FBI in Justice).
Among the objectives of the 1945 Pay Act were economy and efficiency in the employment of personnel and in the use *783 of employees’ time. The standards of work of the four agencies above-named had been established on the basis of a workweek of 48 hours or more. Personnel strength had been set on this basis. The spirit, if not the letter, of the Act forbade any request for additional personnel. As a practical matter, two avenues only were open to these agencies to maintain their standards of performance. One was to authorize overtime, and pay for it. This would require additional appropriations, which were likewise contrary to the spirit of the Act. The other avenue lay through the use of “voluntary” overtime. This, without exception, was the avenue chosen.
Inasmuch as two agencies within the Department of Justice elected the “voluntary” overtime route and remained committed to it until 1954 (when the law was changed, as hereinafter noted), it seems strange that the Attorney General did not call his subordinates’ attention to the 1906 statute which precluded acceptance of voluntary service for the United States, if he deemed it applicable to the situation.
The “volunteers” who were performing the overtime were none too happy about their situation, in any of the affected agencies. The fact that they were being deprived of overtime pay, authorized and directed by law, because of administrative and budgetary difficulties, soon came to the attention of the Congress, through which it was brought to the attention of the Civil Service Commission, the Bureau of the Budget, and the President.
Corrective legislation was drafted and introduced in the Senate. The responsible Senate Committee asked for a study of the situation by the Civil Service Commission and the Bureau of the Budget.[29] The study was made and results reported.[30] Amended drafts of legislation were prepared and introduced, only to be replaced in turn by a comprehensive Administration proposal.[31] From these there emerged the Federal Employees Pay Act Amendments of 1954, which applied the solution hereinafter noted.
*784 Throughout the Congressional hearings and reports, the overtime which the agencies considered “voluntary” was characterized as “irregular,” “unscheduled,” or “occasional” overtime, the chief differentiating attribute of which was that the necessity for its performance lay within the judgment and discretion of the employee. The responsible committees of Congress never questioned the intent and purpose of the 1945 Pay Act to compensate these employees for their “irregular” overtime services. The only question was how to provide such payment. The answer at which Congress arrived, with the aid and counsel of the administrative agencies, was the so-called premium pay.
Meanwhile, the border patrolmen of the Customs Service, and now those of the Immigration Service, have sued in this court for payment of their overtime according to law. The court has found, in Anderson, with respect to customs border patrolmen, and in the instant cases, with respect to immigration border patrolmen, that the overtime was not performed voluntarily, but was induced by the officials responsible for the direction of the Services, although in each instance authorization or approval in writing was withheld.
If, as defendant contends in the instant cases, recovery must be denied because officials of the Department of Justice lacked authority to induce, or to permit the Commissioner of Immigration to induce overtime services without authorization or approval in writing, the whole burden of such an administrative course of action would be cast upon the patrolmen who performed the services at the instance of the Commissioner of Immigration. The officials of the Department of Justice would have committed a wrong, and the patrolmen would be without remedy. The inequity of such a result is manifest.
Pursuit of defendant’s lack-of-authority and lack-of-appropriations contentions to their logical conclusions further reveals their fallacy. Citizens would be deprived of remedies against the Government in instance after instance. No contracting officer, for example, has authority to violate a contract; nor does Congress appropriate for anticipated breach. The Commissioner of Internal Revenue is not au *785 thorized to impose an overassessment of taxes; nor does Congress appropriate repayment until an overassessment has been determined. No officer of or contractor with the Government has authority to infringe a patent, nor does Congress appropriate for infringement until the fact has been established.
Plaintiffs in these cases were induced to perform overtime services for which the statute said they should be compensated. The compensation has been withheld. Plaintiffs say the withholding was wrongful. Defendant replies that the inducement was wrongful, wherefore plaintiffs are without remedy. If the plaintiffs had been wrongfully discharged, they would be entitled to recover for services they did not perform. To say that they should not be paid for services they did perform because performance was wrongfully induced reflects inapposite rationalization.
IV
Since 1945, there have been several amendments and modifications of the Federal Employees Pay Act of 1945.[32]
Efforts to modify and clarify the overtime pay provisions of the Act were begun in 1950 and culminated in the Act of September 1, 1954.[33] Title II of the 1954 statute contained “Amendments to the Federal Employees Pay Act of 1945, as Amended,” and provided that “[T]his title may be cited as the ‘Federal Employees Pay Act Amendments of 1954.’ ”
Among the “Special Provisions for Certain Types of Work” in the Federal Employees Pay Act Amendments of 1954 was the f ollowing:
*786 Sec. 401. The head of any department * _ * * or agency * * * may, with the approval of the Civil Service Commission, provide that * * *
(2) any officer or employee in a position in which the hours of duty cannot be controlled administratively, and which requires substantial amounts of irregular, unscheduled, overtime duty and duty at night and on holidays with the officer or employee generally being-responsible for recognizing, without supervision, circumstances which require him to remain on duty, shall receive premium compensation for such duty on an annual basis in lieu of premium compensation provided by any other provisions of this Act, except for regularly scheduled overtime duty. Premium compensation under this paragraph shall be determined as an appropriate percentage (not in excess of 15 per centum) of such part of the rate of basic compensation for any such position as does not exceed the minimum scheduled rate of basic compensation provided for grade GS-9 * * by taking into consideration the frequency and duration of night, holiday, and unscheduled overtime duty required in such position.
The report of the Senate Committee[34] on the bill which later became the Federal Employees Pay Act Amendments of 1954 stated that section 401(2), as hereinabove quoted, was “specifically directed at those investigators of criminal activities whose positions meet all the conditions specified,” and noted that “[I]t would permit similar payments to employees in other types of positions in which all the same conditions are present in an equivalent degree.”[35] The reference in the first clause quoted to “investigators of criminal activities” was to “FBI agents and narcotics investigators in the Treasury Department.”[36] The reference in the second clause quoted to “employees in other types of positions in which all the same conditions are present in an equivalent degree” was broad enough to cover the inspectors of the Immigration Border Patrol.
*787 With, the approval of tbe Civil Service Commission, inspectors of the Immigration Border Patrol became eligible for premium pay under the foregoing provision on April 24, 1955, and have since received such premium pay.
The above-quoted portion of section 401 was contained in section 208(a) of the Act of September 1, 1954. Section 208(b) provided as follows:
* * * Nothing contained in this section shall be construed to decrease the existing aggregate rate of compensation of any present employee, but when the position of such employee becomes vacant any subsequent appointee thereto shall receive premium compensation provided for such position in accordance with this section.
Finding 18(c) recites that:
Since April 24, 1955, some of the plaintiffs who were patrol inspectors on and before the date of the enactment of the 1954 Act have at times worked more than 6 hours in 1 week of the kind of irregular, unscheduled overtime for which the premium pay is made under the 1954 Act.
The savings clause preventing any decrease of the “existing aggregate rate of compensation of any present employee” was inserted on motion of the Senate conferees, based on a Senate amendment, “in order to prevent a reduction in compensation for a number of firefighters now in the service * * [37]
The firefighters’ provision in the Federal Employees Pay Act Amendments of 1954 was in section 401(1), as follows:
Seo. 401. The head of any department * * * or agency * * * may, with the approval of the Civil Service Commission, provide that—
(1) any officer or employee in a position requiring him regularly to remain at, or within the confines or, his station during longer than ordinary periods of duty, a substantial part of which consists of remaining in a standby status rather than performing work, shall receive premium compensation for such duty on an annual *788 basis in lieu of premium compensation provided by any other provisions of this Act. * * * [38]
The firefighters’ claims under the foregoing provisions[39] were before the court in Bean v. United States.[40] The firefighters had received premium compensation under section 401(1) since November 1, 1954, and were demanding additional compensation for standby hours allegedly in excess of the amount on which the premium compensation was based. Following is an excerpt from the court’s opinion:
* * * The only purpose of subsection (b) was to prevent the reduction in the actual pay an employee had received prior to the passage of the Act. It was not intended by this section to increase the compensation of these employees, unless they were entitled to it by virtue of the premium compensation provision of the 1954 Act. * * *
Finding 13 (d) [as made by the trial commissioner] recites that:
The aggregate rate of compensation of patrolmen employed on or before September 1, 1954 (the date of the enactment of the Federal Employees Pay Act Amendments of 1954) is not in evidence. Consequently, there is no evidence to show that application of the premium pay provisions of that Act to patrolmen on and after April 24, 1955, resulted in a decrease of the “existing aggregate rate of compensation of any present employee.”
Absent a showing that application of the premium rate payable to patrolmen under section 401(2) would “decrease the existing aggregate rate of compensation of any present *789 employee,” plaintiffs are not entitled to recover for irregular, unscheduled overtime performed on or after April 24,1955.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner W. Ney Evans, and the briefs and arguments of counsel, makes findings of fact as follows:
1. (a) Plaintiffs are immigration patrol inspectors of the Border Patrol of the Immigration and Naturalization Service.
(b) They seek by these actions to recover additional pay for irregular, unscheduled overtime services. Their claims rest upon the application of the provisions of the Federal Employees Pay Act of 1945,[41] as amended, and the Federal Employees Pay Act Amendments of 1954.[42]
(c) Each plaintiff claims for the period of his services, subject to limitation of recovery to the 6 years immediately preceding the date of action filed by him. There are 100 individual claimants in the 9 actions.[43]
2. (a) At the pretrial conference the attorneys for the parties agreed, and in the pretrial conference memorandum the commissioner ordered: (1) that the cases in caption should be consolidated for trial and for briefing and argument before the court; and (2) that the trial of the consolidated actions should be limited to the issues of law and fact relating to the right of the plaintiffs to recover, reserving for further proceedings determination of the amount of recoveiy and the amount of offsets, if any.
(b) At the pretrial conference defendant was granted leave to assert, in each of the cases, the following additional, affirmative defense:
Each of the plaintiffs is guilty of laches, because each accepted the compensation paid 'by defendant without protest and waited a number of years before instituting this suit with resulting damage to the defendant.
*790 No evidence was offered by defendant to show damage or prejudice to it resulting from plaintiffs’ timing of the assertion of their claims.
(c) At the pretrial conference there were received in evidence, on behalf of defendant, 14 exhibits; and defendant also agreed, 'by way of stipulation, to certain facts set forth in the pretrial conference memorandum. These items represent the extent of evidence offered by defendant.
(d) At the trial of the consolidated actions, and upon completion of plaintiffs’ evidence,[44] defendant moved for dismissal on the grounds that upon the facts and the law plaintiffs had not shown a right to recover. This motion was denied in open court. Defendant thereupon elected to rest upon the record as made and offered no further evidence.
3. (a) The primary mission of the Border Patrol of the Immigration and Naturalization Service is to detect or prevent the smuggling and unlawful entry of aliens into the United States and to apprehend persons guilty of such violations.
(b) As early as 1904, mounted inspectors patrolled the Mexican border to curb the illegal entry of Orientals. This group of no more than 75 officers, later called mounted guards, was the forerunner of the Border Patrol.
(c) By the Act of May 28, 1924,[45] Congress recognized the need for better control of the land borders by providing for additional land-border patrol. This Act marked the establishment of the Border Patrol as part of the then Bureau of Immigration.
(d) The Act of February 27, 1925,[46] extended Border Patrol activities to the coastal areas and provided the basic authority to make arrests in the enforcement of immigration laws. This authority has been amplified and carried into the Immigration and Nationality Act.[47]
(e) The first officers of the Border Patrol were selected from the ranks of mounted guards and a civil service register for railway postal clerks. They learned their jobs by *791 experience and by association with, other officers of the Burean of Immigration.
(f) Formal training of Border Patrol officers began with a part-time school, established in 1934. There is now a Border Patrol Academy. The Border Patrol has developed from a group of small, stationary, loosely organized units, into a coordinated, flexible, mobile organization, administered on a regional basis, subject to assignment and capable of immediate movement to any part of the United States.
(g) The authorized strength of the Border Patrol has varied from approximately 700 to 1,594 officers. The peak was reached during World War II when the Service assumed the responsibility of operating the enemy alien internment camps. At the time of the trial of these actions the authorized force was 1,490 patrol inspectors, 36 airplane pilots, and 397 auxiliary personnel.
4. (a) During the period covered by these suits the Immigration and Naturalization Service was part of the Department of Justice. The line of administrative authority ran from the Attorney General to the Commissioner of Immigration and Naturalization, thence through various subordinates to the Border Patrol.
(b) At the time of the trial of these actions there were, in the chain of command of the Immigration Service and its Border Patrol, four regional commissioners, chief patrol inspectors in charge of sectors, and patrol inspectors in charge of stations. Operations of the Border Patrol were supervised by the Assistant Commissioner, Enforcement, who was responsible to the Deputy Associate Commissioner, Domestic Control, who was assisted by deputy and assistant chiefs of the Border Patrol.[48]
(c) Negions are divided into sectors. Sector boundaries are based upon topography and potential alien traffic rather than on district or political boundaries. The sectors are supervised by chief patrol inspectors aided by one or more assistants.
*792 (d) A sector consists of a headquarters office and a number of strategically located stations supervised by senior patrol inspectors. Stations vary greatly in strength. Larger stations are organized into several units. Units are supervised by senior patrol inspectors responsible to the station senior patrol inspector.
5. The principal methods used by the officers of the Border Patrol in carrying out their functions are:
(a) Inspecting highway and railroad traffic on routes of egress from border areas, in search of smugglers and illegal entrants; interrogating persons on such routes suspected of having entered unlawfully.
(b) Watching, by day and night, points on the border known to be used by smugglers and aliens who attempt to enter unlawfully.
(c) “Sign cutting,” i.e., searching for tracks of illegal crossers of the boundary, and tracking them down.
The duties of a patrol inspector also include conducting investigations and gathering evidence for use in deportation proceedings and in the prosecution of criminal cases.
6. (a) The Federal Employees Pay Act of 1945 [49] (1) established a basic administrative workweek of 40 hours (to be performed within a period of not more than 6 of any 7 consecutive days) ; (2) directed that additional compensation be paid “for all hours of employment, officially ordered or approved, in excess of 40 hours in any administrative workweek” at specified overtime rates; (3) authorized compensatory time off duty in lieu of overtime compensation for occasional overtime work; (4) ordered payment of a 10 percent differential for night work (between 6 p.m. and 6 a.m.); and (5) specified payment of time and one-half for work on holidays (effective “upon the cessation of hostilities in the present war”).
(b) Section 605 of the Act[50] provided as follows:
The Civil Service Commission is hereby authorized to issue such regulations, subject to the approval of the President, as may be necessary for the administration of
*793 the foregoing provisions of this Act insofar as this Act affects officers and employees in or under the executive branch of the Government.
(c) On July 4, 1945, Executive Order 9578 directed the heads of departments to establish, with respect to each group of full-time employees, a regularly scheduled workweek consisting of the 40-hour basic workweek plus such period of overtime work as would be regularly required. The order further specified that all affected employees should be paid overtime compensation for all hours of employment officially ordered or approved in excess of 40 hours in any administrative workweek, including irregular or occasional overtime duty; and authorized heads of departments to delegate “to any officer or employee” authority to order or approve overtime, provided that: “No overtime in excess of the administrative workweek shall be ordered or approved except in writing by an officer or employee to whom such authority has been specifically delegated * *
7. (a) During World War II inspectors of the Immigration Border Patrol worked 48 hours per week as a standard workweek, receiving (as did virtually all other Federal employees) basic pay for 40 hours and overtime pay for 8 hours.
(b) Within a few days after the cessation of hostilities in August 1945, the Commissioner of Immigration and Naturalization placed the Service on a 40-hour week and notified all supervisors that no overtime could be scheduled without Central Office approval. The then incumbent Commissioner testified at the trial of these actions:
* * * What we had in mind was the fact that the law came into effect which authorized paid overtime or compensatory time off, and we were not in the fiscal position of doing the former, that is, paying the overtime, and so we sought to alert the patrolmen that that was the situation. They could not expect as a general matter to be paid for overtime that they might perform.
We reached this conclusion: * * * that if as a result of our inability to pay the overtime no overtime was performed, our work objectives and the quantity and quality of our work would drop to a point that we would prefer not to have to do it.
*794 (c) On August 12, 1946, the Administrative Manual of the Service was amended to provide as follows:
Compensatory Leave: Compensatory leave may be granted hour for hour, for overtime, where the employee has requested compensatory leave in preference to payment in money; compensatory leave may be used within the next seven biweekly pay periods following that during which it was earned. Failure to use compensatory leave within this period will result in its forfeiture, unless the failure was due to an exigency of the Service beyond the control of the employee and provided further that the employee had not had ample opportunity to use the compensatory leave prior to the occurrence of the exigency. In such cases further extensions may be granted at administrative discretion, when approved by the District Director.
(d) There is no evidence of the extent of the use, if any, of this provision by the Service.
8. (a) During the period of time extending from the cessation of hostilities in August 1945 to the change of Administrations in January 1953, the Immigration Service accommodated to its need for overtime services by the patrolmen in two ways: (1) Some overtime was duly authorized and approved (and has been paid for); and (2) some overtime was performed which was neither authorized nor approved in writing (within the meaning of Executive Order 9578) and became known administratively as voluntary overtime.
(b) Overtime was duly authorized and approved in writing for occasional special assignments of extra men to a specified locality during a period of peak load. The method generally used was to assign a 6-day week, with authorization to pay overtime for the 6th day. Such an assignment required a man to be on duty for a minimum of 48 hours during the week. (Many of the men worked 7-day weeks during these assignments). Overtime pay was never authorized in writing for hours in excess of 48.
(c) The phrase “voluntary overtime” was used administratively to describe the extra hours worked by the patrolmen when, according to their own best judgment, extra *795 hours of work were requisite to completion of the tasks in hand.[51]
(d) By January 1953,[52] these two types of overtime were in common usage in the Service. They have been continued ever since.
(e) The Immigration Service has continued the use, administratively, of the phrase “voluntary overtime” to describe the extra hours worked by officers responsible for determining, on their own initiative, the need for emergency services.
(f) During the years 1950^1954, overtime of the kind described in the preceding paragraph acquired recognition in legislative history as “irregular, or unscheduled overtime.”
9. (a) On Jaauary 27,1953, the Attorney General directed in writing that all paid overtime for employees of the Department of Justice had to be ordered by the head of the division or office and approved in advance by the Deputy Attorney General or the Administrative Assistant Attorney General. There is no proof that any of the overtime claims in these cases was approved in advance by either of the latter two officials.
(b) On June 1, 1955, authority to approve overtime for pay purposes was delegated to the Commissioner of Immigration and Naturalization.
(c) There is no claim, in any of those cases, for overtime of the type defined in finding 8(b). All such overtime has been paid for.
(d) There is no claim, in any of these cases, that overtime of the type defined in finding 8(c) has been authorized or approved “in writing by an officer or employee to whom such authority has been specifically delegated.”
*796 10. (a) The Service Supplement to the Federal Personnel Manual, under date of October 21, 1955, provided as follows:
E — COMPENSATORY LEAVE
1. — Nature. Compensatory leave is a grant of time oif from duty equal to the number of overtime hours an employee has worked for which he is not otherwise recompensed. It may not be granted to any officer whose pay equals or exceeds the maximum pay for GS-15 ($12,690) a year or more.
2. — Limitation. Compensatory leave must be taken within seven pay periods from the time it is earned. However, an exception may be made when operating requirements make it administratively impracticable to grant such leave within the above time limit. Final determination as to when an employee is permitted to take compensatory leave will be made by the head of the organizational unit. Any exception to the specified time limit for the taking of such leave must be approved at a level not lower than Regional Administrative Officer or Central Office division heads. When exceptions are made, the employee will be required to take his compensatory leave as soon afterwards as operating requirements permit.
(b) During the period of time encompassed by these claims, plaintiffs made out their own Time and Attendance Reports on Standard Form 1180. Under the heading “Time Spent in Pay Status” this form had a column for recording overtime work for which compensatory time could be claimed. Another column, under the heading “Time Absent” could be used for recording all compensatory leave taken. Still another column provided for carrying forward unused compensatory leave. A Service directive issued on February 28, 1954, provided that supervisory officers should be responsible for the accuracy of the compensatory time section of Standard Form 1130 and the maintenance at the supervisory level of records relating thereto.
(c) There is no evidence of the extent of the use, if any, of compensatory leave by any of the plaintiffs.
11. (a) At all times material to these claims the regularly scheduled weekly tour of duty for patrol inspectors consisted of five 8-hour days. Each senior patrol inspector was *797 required to prepare 2 weeks in advance a predetermined work schedule which was mailed to the district office (or to the regional office, after the regions were established). This schedule required posting of the “on-duty” and “off-duty” days for the 2-week period. Each senior patrol inspector was required also to prepare 2 weeks in advance a detailed assignment schedule showing the nature of the duty to which each officer was assigned, the vehicle to be used, the hours of duty to be worked, and the geographical area to be covered. A copy of this assignment schedule was posted on the bulletin board at the station office and a copy mailed to the chief patrol inspector.
(b) These advance charts were followed as far as the exigencies of the work permitted. The demands upon the Service were such, however, that there was no uniform tour of duty for a patrol inspector. Hours of duty had to be staggered as occasion demanded, and posts of duty requiring 24-hour service had to be manned with three shifts.
(c) Because of the nature of the law enforcement work of the Border Patrol, emergencies arose which caused work to be performed beyond normal hours. The officer was responsible for ascertaining the need for emergency services. Pursuit and apprehension of an alien who had entered illegally often could not be completed within an officer’s shift. Many of the officers (including many of the plaintiffs in these actions) worked extra hours whenever in their opinion the need existed for additional work to accomplish the task.
12. (a) The completion of assignments, as the measure of a good patrolman, was a tradition in the Service long before the 1945 Pay Act was adopted. Before and during World War II, patrolmen put in extra time (beyond the hours for which they were compensated) when in their judgment such overtime was required to accomplish their tasks.
(h) Before the 1945 Pay Act was adopted, the patrolmen had no reason to hope for additional pay for extra hours worked. After the Act they realized that additional pay for overtime had to be withheld only because of administrative and budgetary problems in the Service. As a consequence of the 1945 Pay Act the Service found it necessary to emphasize the importance to it of completion of assignments *798 by the patrolmen to offset the understandable dissatisfaction of the patrolmen resulting from the deprivation of overtime pay for overtime hours.
(c) Since the end of World War II each trainee for a patrolman’s position has served 1 year on probation as an apprentice. Some of this time was spent in training school, but most of it was spent on duty in the field under the tutelage of a succession of journeymen patrolmen. Each journeyman impressed upon trainees under his supervision the importance of completing an assignment. Time was not to be considered. If the task required more than 8 hours per day or 40 hours per week, it had to be completed nevertheless. The trainees learned, quite incidentally, that extra hours spent in completion of an assignment would not be paid for. The training was so thorough that, by the time an apprentice became a journeyman, the importance to the Service (and to his own hopes for advancement) of completing the task was part of his mental habit.[53]
(d) All of the irregular, unscheduled overtime described in these findings as not having been paid for was induced by the Service, with the knowledge and approval of the Commissioner of Immigration and Naturalization and his subordinate administrative officers above the rank of patrolman, through the indoctrination of the patrolmen concerning the importance to the Service of completing the task at hand.
(e) The phrase “irregular, unscheduled overtime,” as developed in legislative history, is a more accurate characterization of the work than the phrase “voluntary overtime,” used by administrative channels in the Immigration Service. The work Was voluntary only in the sense that the inspectors recognized (1) the futility of trying to stop the detection and pursuit of illegal entrants at 5 o’clock, to be resumed at 8 the next morning; (2) the impossibility of administrative provision to compensate them for the extra hours; and (3) that their only choice, in honor and conscience, was to do what the job required (including overtime) or resign from the Service.
*799 13. (a) Section 208(a) of the Federal Employees Pay Act Amendments of 1954[54] added a new section to the Federal Employees Pay Act of 1945 as follows (in pertinent part):
Sec. 401. The head of any department, independent establishment, or agency, including Government-owned or controlled corporations, or of the municipal government of the District of Columbia may, with the approval of the Civil Service Commission, provide that:
# * * * *
(2) any officer or employee in a position in which the hours of duty cannot be controlled administratively, and which requires substantial amounts of irregular, unscheduled, overtime duty and duty at night and on holidays with the officer or employee generally being responsible for recognizing, without supervision, circumstances which require him to remain on duty, shall receive premium compensation for such duty on an annual basis in lieu of premium compensation provided by any other provisions of this Act, except for regularly scheduled overtime duty. Premium compensation under this paragraph shall be determined as an appropriate percentage (not in excess of 15 per centum) of such part of the rate of basic compensation for any such position as does not exceed the minimum scheduled rate of basic compensation provided for grade GS-9 in the Classification Act of 1949, as amended, by taking into consideration the frequency and duration of night, holiday, and unscheduled overtime duty required in such position.
(b) Nothing contained in this section shall be construed to decrease the existing aggregate rate of compensation of any present employee, but when the position of such employee becomes vacant any subsequent appointee thereto shall receive premium compensation provided for such position in accordance with this section.
(b) Since April 24, 1955, plaintiffs have received, pursuant to the foregoing provisions of the 1954 Act, premium compensation at the rate of 15 percent of their basic salaries.
(c) Since April 24, 1955, some of the plaintiffs who were patrol inspectors on and before the date of the enactment[55] of the 1954 Act have at times worked more than 6 hours *800 in 1 week of tbe kind of irregular, unscheduled overtime for which the premium pay is made under the 1954 Act.
(d) The aggregate rate of compensation of patrolmen employed on or before September 1, 1954 (the date of the enactment of the Federal Employees Pay Act Amendments of 1954), or on or before April 23, 1955, is not in evidence. There is also no evidence to show that application of the premium pay provisions of that Act to patrolmen on and after April 24, 1955, resulted in a decrease of the “existing aggregate rate of compensation of any present employee.”
14. (a) Following are: (1) the names of the individual plaintiffs in these consolidated actions, in alphabetical order; (2) the style of the action in which the individual joins; (3) the date his petition was filed; and (4) the date of the beginning of the 6-year period before action filed.

*801

(b) The claims in behalf of the individual plaintiffs listed below have been withdrawn:
(1) From the case of Kenneth S. Adams, et al., No. 66-59: John E. Beeman (5) and Arthur Goings (18).
(2) From the case of Bichard Paul Bellerue, et al., No. 88-59: Vaughn Bunch ('3) and Daniel C. Wootton (13).
*802 (3) From tlie case of James O. Brazell, et al., No. 264-59: Claudie Raymond Murray (6).
(c) As to two of the plaintiffs in the case of Kenneth S. Adams, et al., No. 66-59, defendant denies that they were immigration patrol inspectors or that they performed services in the Border Patrol within the period of time covered by the claims set forth in that petition. The two claimants are: Fred N. Thomas (38) and James L. Turner (39). No evidence was offered to refute defendant’s denial.
CONCLUSION OK LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs (except those listed in finding 14 (b) and (c)) are entitled to recover for irregular, unscheduled overtime performed prior to April 24, 1955 and that they are not entitled to recover for such overtime performed on and after that date.
Unless the parties stipulate the amount of the recovery in each instance, further proceedings as contemplated by Buie 38(c) will he necessary for the determination of such amounts.

 The earliest petition was filed on February 11, 1959, and therefore no claim of the plaintiffs in that case can be allowed which arose before February 11, 1953. The other petitions were filed on later dates.

 In Albright, et al. v. United States, 161 Ct. Cl. 356 (1963), and In Gaines v. United States, 158 Ct. Cl. 497 (1962), cert. denied, 371 U.S. 936, there was no showing that the work-period for which overtime pay was denied by the court was ordered, approved, or induced by an officer empowered to do so.

 At the bar, defendant’s counsel disavowed any interpretation of the Attorney General’s order which would have permitted a blanket advance approval of overtime work for a prolonged period, or a ratification after the work had been performed.

 27 Stat. 675, 715.

 Act of March 15, 1898, 30 Stat. 277, 316.

 Act of March 3, 1931, 46 Stat. 1482.

 Section 601 of the Federal Employees Pay Act of 1945, 59 Stat. 295, 302, specified that: “The provisions of this Act shall not operate to prevent payment for overtime services or extra pay for Sunday or holiday work in accordance with any of the following statutes: * * * Provided, That the overtime, Sunday, or holiday services covered by such payment shall not also form a basis for overtime or extra pay under this Act.” The statutes listed were: (1) the Act of February 13, 1911, 36 Stat. 901, relating to customs port inspectors; (2) the Act of July 24, 1919, 41 Stat. 241, relating to certain employees of the Bureau of Animal Industry of the Department of Agriculture; (3) the Act of June 17, 1930, 46 Stat. 715,. amending the provisions relating to customs inspectors; (4) the Act of March 2, 1931, 46 Stat. 1467, relating to immigrant inspectors; (5) the Act of May 27, 1936, 49 Stat. 1385, relating to employees of the Coast Guard and to certain customs port employees; (6) the Act of March 23, 1941, 55 Stat. 46, relating to radio inspectors employed by the Federal Communications Commission; and (7) the Act of June 3,. 1944, 58 Stat. 269, further amending the provisions relating to customs port inspectors.

 For example, the Act of June 28, 1940, 54 Stat. 676, established the “* * * regular working hours of the Navy Department and the Coast Guard and their field services * * *” as “eight hours a day or forty hours per week * * *” and authorized overtime pay for work in excess of 40 hours by certain classes of employees. Similarly, the Act of October 21, 1940, 54 Stat. 1205, established overtime rates for “compensation for * * * employees of the field services of the War Department and the * * * Panama Canal * * To the same effect, see also the Act of June 3, 1941, 55 Stat. 241.

 Act of June 28, 1940, 54 Stat. 676.

 Joint Resolution of December 22, 1942, 56 Stat. 1068.

 Act of May 7, 1943, 57 Stat. 75.

 56 Stat. 1068.

 57 Stat. 75.

 59 Stat. 295.

 In. the absence of statutory authorization for overtime pay, Federal employees generally would have been required during the war to work 48 hours while being paid for a 40-hour week.

 The overtime rates specified in section 201(b) took cognizance of the 48-hour administrative workweek in effect during the war by providing “overtime rate[s] of compensation per 416 overtime hours,” i.e„ 8 hours overtime per week for 52 weeks.

 This provision in the 1945 Act authorized the use of lieu time only for work in excess of 48 hours. The 48-hour specification was changed to 40 hours by section 9 of the Federal Employees Pay Act of 1946, approved May 24, 1946, 60 Stat. 216, 218.

 10 F.R. 8191; 3 C.F.R. 1945 Supp., p. 86.

 All of the foregoing text appeared as findings in Anderson v. United States, 136 Ct. Cl. 365 (1956), and was stipulated into the present cases in the Pretrial Conference Memorandum.

 The Customs Patrol Service ceased to exist on July 24, 1948.

 Anderson v. United States, 136 Ct. Cl. 365 (1956).

 The first oí these consolidated actions was filed in 1959; the last in 1961. In each instance recovery is sought for the overtime worked during the 6 years next preceding the filing of the petition. The period covered by these suits includes, therefore, a portion of 1953 and all years since. None of the claims dates back of 1953.

 At the time of Anderson, supra, the Customs Service was, and it now is, in the Treasury Department. Customs and Immigration are therefore unrelated in the top echelons of administration. From earlier eases in this court, however, it appears that their problems of local administration are similar. Inspectors for the two services often work side by side. The employees of one Service quickly become aware of of the wages, hours, and working conditions of the other. As divergencies appear, pressure mounts on top management to even things out. Such has been the history of the two initial overtime pay acts: the Act of February 18, 1911, 36 Stat. 901, relating to customs port inspectors ; and the Act of March 2, 1931, 46 Stat. 1467, relating to immigrant inspectors. See Myers v. United States, 99 Ct. Cl. 158 (1943), modified, 320 U.S. 561 (1944); Renner v. United States, 106 Ct. Cl. 676 (1946); Gibney v. United States, 114 Ct. Cl. 38 (1949); Taylor v. United States, 114 Ct. Cl. 59 (1949); Ahearn v. United States, 114 Ct. Cl. 65 (1949); Schaible v. United States, 135 Ct. Cl. 890 (1956); Wiley v. United States, 136 Ct. Cl. 778, 145 F. Supp. 945 (1956); and Anderson v. United States, 136 Ct. Cl. 365 (1956).

 The problem here, as in the customs cases, is concerned with irregular, unscheduled overtime.
Officers of the Immigration Border Patrol performed some regularly scheduled, duly authorized overtime. There is no claim, in any of these cases, for pay based upon such overtime. Finding 9(c).
All of the claims are for irregular, unscheduled overtime, as to which there is no contention that any such overtime was authorized or approved “in writing by an officer or employee to whom such authority has been specifically delegated.” Finding 9(d).

 Reference is made to tie findings of fact in Anderson, supra, for details of the inducement.

 Finding 7(b).

 The Act of February 27, 1906, 34 Stat. 49, 8-1 U.S.C. 665, provides: “* * * (b) Voluntary service forbidden. No officer or employee of the united States shall accept voluntary service for the United States or employ personal service in excess of that authorized by law, except in cases of emergency involving the safety of human life or the protection of property.”

 The Act of June SO', 1906, 34 Stat. 764, 31 U.S.C. 627, provided: “No Act of Congress passed after June 30, 1906, shall he construed to make an appropriation out of the Treasury of the united States, or to authorize the execution of a contract involving the payment of money in excess of appropriations made by law, unless such Act shall in specific terms declare an appropriation to be made or that a contract may be executed.” The Federal Employees Pay Acts contained no such appropriation.
In Anderson the court said, as hereinabove noted, that the customs officers’ “* * * superiors were not authorized to deny to them the benefits of the act, on the ground that * * * money had not been provided to pay the employees what they were entitled to under the law.”

 Senate Report No. 848, 82d Congress, 1st Session, to accompany S. 354.

 Id.

 Fringe Benefits for Federal Employees. Hearings before the Committee on Post Office and Civil Service, united States Senate, 83d Congress, 2d Session, on S. 2665.

 Only one of the 14 separate acts amending the 1945' Pay Act is material here: the Act of September 1, 1954, 68 Stat. 1105. The others (for convenience of reference) are: the Act of May 24,1946, 60 Stat. 216 ; the Act of August 4, 1947, 61 Stat. 727; the Act of July 3, 1948, 62 Stat. 1260, 1268; the Act of June 23, 1949, 63 Stat. 264, 265; the Act of October 28, 1949, 63 Stat. 954, 973 ; the Act of June 17, 1957, 71 Stat. 83, 159 ; the Act of July 18, 1958, 72 Stat. 363; the Act of July 18, 1958, 72 Stat. 37t7; the Act of September 2, 1958, 72 Stat. 1256, 1265; the Act of July 31, 1959, 73 Stat. 268; the Act of August 18, 1959, 73 Stat. 384, 389; and the Act of August 29, 1959, 73 Stat. 432, 436.

 68 Stat. 1105; H.R. 2263, 83d Congress; Public Law 763, Chapter 1208, 83d Congress, 2d Session.

 Senate Report No. 1992, 83d Congress, 2d Session, to accompany H.R. 2263. The Report bears the title “Government Employees Fringe Benefits Act of 1964.”

 Id., p. 9.

 Senate Report No. 843, 82d Congress, 1st Session, to accompany S. 354, at p. 4. . The Report bears the title “Federal Employees Overtime Pay Act of 1952.”

 Conference Report, to accompany H.R. 2263 ; Report No. 2665, House ot Representatives, 83d Congress, 2d Session, p. 23.

 This provision was amended by the Act of July 18, 1958, 72 Stat. 363, by aiding the following: “except for irregular, unscheduled overtime duty in excess of his regularly scheduled weekly tour.”
The purpose of the amendment was “to remove an inequity that has arisen in the administration of existing law relating to the overtime pay of firefighters and certain other employees * * * when they are required to work in excess of their regularly established tours of duty.” Report No. 1870, House of Representatives, 85th Congress, 2d Session, to accompany S. 1901.
The House Report further pointed out that the provision of section 401(1), prior to amendment, had “operated to reduce overtime pay in many instances far below the amount of overtime pay affected employees would receive were they given the usual time-and-one-half pay for their unscheduled or irregular duty in excess of their regularly established tours of duty. * * *”

 Prior to amendment.

 146 Ct. Cl. 267, 175 F. Supp. 1166 (1959).

 59 Stat. 295.

 68 Stat. 1105.

 Set forth in finding 14(a) are: (1) the names of the individual plaintiffs, in alphabetical order; (2) the style of the action in which the individual joins; (3) the date his petition was filed; and (4) the date of the beginning of the 6-year period before action filed.

 Plaintiffs’ evidence consists of the testimony of seven witnesses (five of whom are plaintiffs) and eight exhibits.

 43 Stat. 240.

 43 Stat. 1049.

 66 Stat. 163.

 Prior to November 1965, tbe Border Patrol sectors were under the) control of tbe District Offices of tbe Service. Since November 1955, tbe sectors bave been directly responsible to tbe regional offices.

 59 Stat. 295.

 59 Stat. 304.

 The parties have stipulated that: “[B]ecause of the nature of the law enforcement work of the Border Patrol, emergencies arose which caused work to be performed beyond normal hours. The officer was responsible for ascertaining the need for emergency services. For example, pursuit and apprehension of an alien who had entered illegally often could not be completed within an officer’s shift. Many of the officers worked extra hours whenever in their opinion the need existed for additional work to accomplish the task.”

 The date, January 1953, is significant in two respects: (1) It antedates any period of claim in these actions, since the earliest date of claim of any plaintiff is February 11, 1953 ; and (2) it marks the change of Administration, which was followed, in a matter of days, by changes in the authority within the Department of Justice relating to the authorization and approval of overtime.

 The evidence as a whole warrants the conclusion that the completion-of-assignments concept was burnished by the Service to assure performance of “voluntary” overtime, and that the burnishing was as subtle as it was effective. The aim of the Service was accomplished so smoothly that the duality of purpose of the training system, was never apparent.

 68 Stat. 1111, 5 U.S.C. 926.

 September 1, 1954.