By the Review Panel :
By S. Res. 193 of the 91st Congress, 2d Sess., the United States Senate, on June 26, 1970, referred S. 1418, a bill for the relief of Carleton R. McQuown,[1] to the Chief Commissioner of the United States Court of Claims, pursuant to 28 U.S.C. § 1492 (1964) and 28 U.S.C. §2509 (Supp. IV, 1965-8).
The Chief Commissioner referred the matter to Commissioner David Schwartz for proceedings in accordance with the rules, and designated a three-member review panel to consider the trial commissioner’s report on the merits of claimant’s right to receive compensation for overtime work performed by Mr. McQuown while he was employed as an investigator by the Alcohol and Tobacco Tax Unit, Department of the Treasury, during the period from July 1, 1945 through June 30, 1955.
On June 30, 1972, following a trial and briefing by the parties, Commissioner Schwartz issued his opinion and supporting findings of fact. He concluded that the claim was neither legal nor equitable within the meaning of those terms as found in § 2509(c), and that it was foreclosed in any event by the doctrine of laches, a concept of estoppel by which a claimant who files suit within the relevant period of legal limitations, unquestionably not the case here, may nonetheless be foreclosed if found guilty of inexcusable and prejudicial delay in commencing the suit. Alpert v. United States, 161 Ct. Cl. 810, 820-21 (1963).
Claimant neither noted exception to Commissioner Schwartz’ opinion, as provided by Rule 141(a), nor responded to defendant’s motion of August 10, 1972, pursuant to Rule 141 (b), to adopt that opinion.
Believing that the absence of formal exception by the losing party does not relieve the review panel of the substantive responsibilities assigned it by 28 U.S.C. § 2509(d), we have considered the trial commissioner’s thorough and ex *862 tensive opinion in the light of the entire record in the cause. Having done this, we find ourselves in full agreement with the end-result reached by Commissioner Schwartz and, with one exception, in substantial accord with his supporting reasoning and underlying findings of fact. Thus, we agree that claimant had no enforceable legal claim at any time after 1961 because of the six-year limitation on institution of suit imposed by 28 U.S.C. § 2501 (1970). Further, we agree with the trial commissioner’s conclusion that the facts and circumstances surrounding Mr. McQuown’s failure to timely sue do not fairly suggest that his delay was excusable to the degree necessary to justify lifting the bar of limitations in this instance. We therefore agree that this is not an equitable claim within the intendment of 28 U.S.C. § 2509 (c) and for that reason subscribe to the trial commissioner’s ultimate recommendation that S. 1418 not be enacted.
Our disagreement relates primarily to Commissioner Schwartz’ stated views on the matter of laches. As earlier noted, an indispensable element of laches is a showing by the party invoking the doctrine that it was actually prejudiced by the delay of the party against whom the estoppel is to be applied. Detling v. United States, 193 Ct. Cl. 125, 131-32, 432 F. 2d 462, 465-66 (1970).
The prejudice perceived and relied on here by the trial commissioner was the Government’s routine destruction of payroll records from which the precise details of overtime worked by the decedent could have been determined. The importance of these official records pales, however, when it is recognized that the Government never resisted the decedent’s claims for overtime pay on the ground that he did not, in fact, put in the overtime that he alleged. Eather, it uniformly appears from the record that, on the merits, the sole basis for the Government’s resistance was that the overtime involved was not compensable because it was not specifically ordered or approved in writing by decedent’s superiors. Notably, as recently as its brief to the trial commissioner in this matter, this asserted lack of formal direction or approval remained the Government’s principal ground for denying the merit of the claim for compensation. Moreover, as found by the trial commissioner, the admissible evidence adduced in this proceeding left no real doubt as to *863 the specific amounts of overtime put in each year by the decedent. (Finding 15, infra.) Thus, there is no reason to presume that the records routinely destroyed by the Government would have done more than simply corroborate the conclusions implicit in the extrinsic evidence to be found in the present record.
Accordingly, even if there are some special circumstances in which an otherwise meritorious claim for overtime pay may be barred by laches,[2] the doctrine is inapplicable here because it affirmatively appears that the Government was not in fact prejudiced by the decedent’s failure to enforce his rights by filing suit before the Government destroyed its records of his overtime.
There follows the trial commissioner’s opinion and findings of fact, both of which are adopted by this panel after modification in accordance with the preceding remarks.
Senate Resolution 193, 91st Cong., 2d Sess. (1970), referred S. 1418, 91st Cong., 1st Sess. (1969), “A bill for the relief of Carleton R. McQuown,” to the Chief Commissioner of the United States Court of Claims, with the direction that in accordance with 28 U.S.C. §§ 1492 and 2509, he “report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.”
S. 1418, the bill referred, provides for the payment of $7,278.31 to Carleton R. McQuown
in full satisfaction of all his claims against the United States for compensation for overtime work performed by the said Carleton E. McQuown while employed as an investigator by the Alcohol and Tobacco Tax Unit, Department of the Treasury, during the period from July 1,1945, through June 30, 1955: * * *
Carleton E. McQuown, the original claimant, died shortly after trial, and he has been succeeded as claimant by his executrix, his widow. He will nevertheless be referred to herein as the claimant.
*864 It is undisputed that claimant performed without compensation a considerable amount of overtime during his 11 years of employment, from 1945 to 1955, as an investigator with the Alcohol and Tax Division of the Internal Revenue Service, as did other investigators in that work. The questions to be resolved, under the Senate Resolution and 28 U.S.C. § 2509(c), are how much overtime was involuntarily performed and otherwise compensable within the meaning of the Federal Employees Pay Act of 1945 (ch. 212, sec. 201, 59 Stat. 296, 5 U.S.C. § 911(a) (Supp. V. 1941-46); now amended and recodified in 5 U.S.C. .§ 5542 (a) (1970)), and if compensable whether the plaintiff has at this date a legal or equitable claim for overtime compensation, including the question whether any bar of the statute of limitations should be lifted.
This report finds that in the 11 years in question, claimant worked 4,095% hours of overtime, not voluntarily; that claimant had a claim for this sum, but that the claim accrued as the work was done, the last claim accruing in 1955, and is now barred by limitations and that there is no good cause to remove the bar of the statute of limitations. Consequently, it is reported that no amount is legally or equitably due from the United States to the claimant and that payment of the claim would be a gratuity.
Claimant began work in 1930 as a prohibition agent in the old Bureau of Prohibition. After the repeal of prohibition, he was transferred to the Atlanta District (now Region) of the Alcohol and Tobacco Tax Division (now Alcohol, Tobacco and Firearms Division) of the Internal Revenue Service. The remainder of his 25-year long career with the Government, until his retirement on June 30, 1955, was spent with this agency, where he served at different times as a special investigator and a criminal investigator. His principal work in both positions was the investigation of moon-shining — the operation of illegal stills — and other violations of statutes whose enforcement was in the care of the Enforcement Branch of the Alcohol and Tobacco Tax Division.
Investigators performed independent work, frequently involving prolonged surveillances of suspected premises, followed by raids, arrests and seizures. Surveillance of moon *865 shiners, if their transport and 'higher-ups and other aspects of the violation were to be uncovered, required frequent overtime. As one witness put it: “You would work when the violators worked.”
Until 1945 there was no statutory provision for the payment of compensation for overtime work, applicable either generally or to the type of work here involved. (For the history to that point of the federal workweek and overtime work, see Adams v. United States, 162 Ct. Cl. 766, 772 et seq. (1963).)
While the Pay Act of 1945 provided a statutory basis for compensation for overtime, no effort was made to transform it into a reality for the investigators of the Alcohol and Tobacco Tax Division. Ironically, on June 28, 1955, 2 days prior to claimant’s retirement, legislation became effective under which the investigators doing claimant’s work became eligible for premium pay as compensation for just such overtime work as he performed — substantial, irregular overtime, unamenable to advance planning and therefore administratively uncontrollable. Federal Employees Pay Act Amendments of 1954, ch. 1208, sec. 208, 68 Stat. 1111 (now 5 U.S.C. § 5545(c) (2)). See Byrnes v. United States, 163 Ct. Cl. 167, 324 F. 2d 966, 330 F. 2d 986 (1963).
Claimant’s right to overtime is based upon the Federal Employees Pay Act of 1945, supra, herein the “Pay Act of 1945.” The act itself required that overtime, to be compensa-ble, must have been “officially ordered or approved.”[3] The regulations required that overtime be ordered or approved in writing.[4]

*866
Compensability of Claimant's Overtime Worh

Defendant argues that overtime work was not explicitly ordered, and that there is no evidence that officials with the authority to approve overtime actually approved the overtime hours claimed by Mr. McQuown. Certainly, the defendant continues, there was no approval “in writing” as required by the applicable regulation.
Claimant, virtually conceding that there was no explicit written directive to work overtime, argues that the overtime work was induced and coerced by his supervisors under threat of termination of employment and comparable sanctions. Such coercion took place, he contends, with the knowledge and approval of officials authorized to approve overtime work, who accepted the benefits of the overtime without making any effort to provide the pay benefits created by statute, thereby estopping the defendant from relying on the provisions that overtime must be officially ordered or approved in writing. Such a theory of recovery of overtime compensation has been firmly established by the decisions of this court in Anderson v. United States, 136 Ct. Cl. 365 (1956); Adams v. United States, supra, and Byrnes v. United States, supra. Ample evidence in the record supports the claimant’s position that his work was coerced under the rule of these cases.
The Regional Assistant Commissioner found in a 1954 study, in connection with the Pay Act Amendments of that year, that overtime was “administratively uncontrollable,” that is, that it was an inherent requirement of the work, which could not be adequately performed without overtime, and that “each and every” investigator did substantial overtime. Investigators in different grades were found to be working, on an average, from 11 to 20 hours of overtime weekly. The Assistant Commissioner further reported that the failure to work overtime would be considered “negligence of duty.” Other evidence is to the effect that failure to work the overtime required for investigations would make it impossible for an investigator to maintain a high efficiency rating, which could lead to termination of employment. The investigators had to maintain a continuing level of overtime work to perform their work and to keep their jobs. Had the *867 investigators requested overtime compensation, their efforts would have been unavailing. Compensatory time off for overtime was, moreover, sharply limited; claimant received such time off only once or twice in the 11 years.
It appears that the senior administrators knew not only the necessity and extent of overtime work, but also that its performance was a condition of continued employment in the Atlanta District. While there is no evidence that the investigators were directly threatened with dismissal or other punitive action for any failure to work overtime, there is preponderating evidence that they were under indirect but real threat of loss of employment should they refuse to work overtime. The overtime work, therefore, was not rendered voluntarily and was compensable under the three cited cases.
In Anderson v. United States, supra, the first of the three cases, 42 former inspectors in the Customs Border Patrol sued to recover compensation for overtime work pursuant to the Pay Act of 1945. The applicable regulation, as here, required written approval for compensable overtime, and the Government argued there as it does here that the overtime work was not officially ordered or approved and was voluntarily rendered. The court found that the performance of overtime work was encouraged, induced and coerced by supervisory officials with the knowledge and approval of the Commissioner of Customs. While the work was not explicitly ordered, it was required as an inherent part of the duties of the employees. The court therefore considered the regulation not determinative, and gave judgment for plaintiffs.
The inducement and coercion here were the equivalent of that in Anderson. If anything distinguishes the quantum of the present proof of inducement from that made in Anderson., it is that here the claimant has not established that the regional officials, including the Assistant Commissioner, actually had been delegated authority to approve overtime. The consequence of such a lack of proof was the question presented in Adams v. United States, supra, a case otherwise similar on its facts to Anderson. Though the plaintiffs failed to establish written approval or delegation of authority to approve overtime, the omission did not prevent the court from reaching the same result as in Anderson, on the theory *868 that the overtime was demanded by the work assigned, to the knowledge of the senior officers. The decision in Adams is applicable to the instant case, and makes it immaterial that it has not been shown that the Assistant Commissioner had explicit authority to approve overtime.
Further relevant authority is found in Byrnes v. United States, supra. There investigators in the Omaha and San Francisco offices of the Alcohol and Tobacco Tax Division sued for overtime compensation, in part pursuant to the Pay Act of 1945. The court found that they had been induced or coerced to perform overtime work in the course of investigations, that they would have been derelict in their duties had they failed to perform such work, and that they were entitled to overtime compensation under the principles of Anderson and Adams.
The defendant argues that the case should be controlled by the decisions that overtime work is not officially ordered or approved where there is mere knowledge of the overtime by supervisory officials not authorized to approve overtime, as e.g., in Bilello v. United States, 174 Ct. Cl. 1253 (1966). The evidence, however, goes beyond establishing mere knowledge or tacit expectation of overtime work, and reaches the level of the evidence of active inducement held sufficient in Anderson, Adams and Byrnes. Claimant and his fellow investigators were directed to do work which could not be done without “administratively uncontrollable” overtime and were given to undei’stand that satisfactory performance of their work required the overtime — that the overtime had to be done. The threat of loss of job was implicit.
It is concluded, therefore, that the overtime work done by Mr. McQuown was compensable under the Pay Act of 1945 at the time it was performed.

The Amount of Claimant's Overtime

The next question is the actual number of hours of overtime worked by claimant. The claim is that between the effective date of the Pay Act of 1945 and his retirement in 1955, claimant worked 4,092% hours, for which he seeks $7,278.31, the dollar amount stated in S. 1418. The number of hours cannot be confirmed from official records. Mr. *869 McQuown’s daily written reports of his investigative activities included his hours on duty, and would have given the actual hours of overtime, but the reports were destroyed no later than January 20, 1962, in accordance with an established Government schedule for the destruction of unneeded records. No other official document gives his hours of overtime.
Claimant offers in substitution a schedule or list of each of the dates on which he worked overtime, following the effective date of the Pay Act of 1945, with the number of hours worked on that day. The list is claimed to have been prepared by Mr. McQuown, after his retirement in 1955, from diaries which have now been lost. The list shows a total of 4,095% hours worked (not 4,092% as stated in the petition). The question is whether the list is admissible in evidence.
When the list is compared with the average hours of overtime reported in the Assistant Commissioner’s 1954 study, it appears that claimant’s overtime hours correspond closely with those of the average investigator in the years 1945 through 1948 — 2,310 hours by Mr. McQuown and 2,526 by the average investigator — and that in the following years, although he continued to work overtime, his hours dropped to a fraction of the average — 1,786 for him and 6,181 for the average — to the point that his total for the 11 years, 4,096 hours, was less than half of the 8,707 hours worked in the same period by the average investigator. The decrease in the years following 1948 is understandable in view of claimant’s increasing age; he became 60 in 1948.
The list was presented by Mr. McQuown in 1962 to a House subcommittee considering a bill for his relief. Before the subcommittee, he testified that he had compiled the list of the hours he had worked from diaries he had kept, and that the list and the diaries were then in the possession of the subcommittee or the Eepresentative who had introduced the bill.
Admission in evidence of the transcript of testimony and the list has been objected to as hearsay. Their author was not present in court, under oath and subject to cross-examination. Both documents are held sufficiently reliable to be admitted in evidence to show the number of overtime hours worked by Mr. McQuown.
*870 Direct testimony of the circumstances surrounding the creation of the list was not possible, for the claimant had suffered a stroke shortly before trial and could not testify. His wife, the main witness on his behalf, testified that he had made up the list from diaries he had kept throughout his employment, and that the diaries had been lost in a household move some years ago.
There is increasing disaffection with the hearsay rule, at least in civil nonjury cases. See Smith, The Hearsay Rule and the Docket Crisis: The Futile Search for Paradise, 54 A.B.A.J. 231, 235-37 (1968); Weinstein, Alternatives to the Present Hearsay Rules, 44 F.R.D. 375 (1968). A large part of the purpose of the rule — the protection of jurors deemed impressionable — is lost in a trial conducted by a judge alone. In civil bench trials, therefore, many experienced judges admit hearsay they deem reasonably reliable and probative, either “for what it is worth” or on some more explicit rejection of the hearsay rule and its some 30 exceptions. McCormick on Evidence, 137 (2d ed. 1972) ; Weinstein, Alternatives to the Present Hearsay Rules, supra; Davis, Hearsay in Nonjury Cases, 83 Harv. L. Rev. 1362 (1970).
Hearsay is the staple of the evidence hi administrative proceedings, to the point that an agency may disbelieve live medical testimony and credit hearsay medical reports. Richardson v. Perales, 402 U.S. 389 (1971). This court customarily reviews administrative decisions based on hearsay and will inquire only into the degree and reasonableness of the reliance on hearsay. E.g., Reil v. United States, 197 Ct. Cl. 542, 456 F. 2d 777 (1972).
There can no longer be any doubt that hearsay is regularly admitted in federal civil bench trials when it is the best evidence available and it is deemed to have assurances of accuracy and, therefore, probative force. See Weinstein, Alternatives to the Present Hearsay Rules, supra. The precise standard is still undergoing development. Some circuit courts hold that Federal Rules of Civil Procedure 43(a) and 44[5] authorize the admission of any relevant probative *871 evidence which in the considered exercise of judicial judgment is deemed trustworthy. See 5 Moore, Federal Practice (2d ed. 1971), ¶ 40.02[3], p. 1316; Note, Federal Rule 43(a): The Scope of Admissibility of Evidence and the Implications of the Erie Doctrine, 62 Colum. L. R. 1049 (1962). The Fifth Circuit in a much-cited decision by Judge Wisdom has held a 50-year-old newspaper story admissible to show the occurrence of a fire at that time “because it is necessary and trustworthy, relevant and material, and its admission is within the trial judge’s exercise of discretion in holding the hearing within reasonable bounds.” Dallas County v. Commercial Union Assurance Co., 286 F. 2d 388, 398 (5th Cir. 1961). Compare the statement by Chief Judge Parker of the Fourth Circuit: “[T]he modern rule [is] to admit in evidence any matter which throws light on the question in controversy, leaving [it] to the discretion of the trial judge to hold the hearing within reasonable bounds”. United States v. 25,406 Acres of Land, 172 F. 2d 990, 995 (4th Cir.), cert. denied, 337 U.S. 931 (1949).
The proposed new federal rules of evidence, which go on the premise of the application of the hearsay rule to both jury and bench trials, propose an exception to the hearsay rule directly relevant to the documents here in question. By proposed Rule 804(b) a former statement of an unavailable witness is to be admissible in five stated situations, and by Rule 804(b) (6) in any other cases where there are circumstantial guarantees of trustworthiness comparable to those in the five explicit exceptions. Comm. on Rules of Practice and Procedure of the Judicial Conference of the U.S., Revised Draft of Proposed Rules of Evidence For United States Courts and Magistrates (Oct. 1971). The Advisory Committee note to Rules 804(b) (6) and 803(24), citing the Fifth Circuit decision in Dallas County v. Commercial Union Assurance Co., supra, states that these rules are intended to “provide for treating new and presently unanticipated situations which demonstrate a trustworthiness within the spirit of the specifically stated exceptions.” Ibid., at p. 123.
Assurances that the proffered evidence is trustworthy and the best available are the requisites for either the utilization of an established exception to the hearsay rule or an ad hoc *872 decision of admissibility. The transcript of testimony and the list of hours worked offer sufficient such assurances.
The solemnity and formality of an appearance in a courtroom are deemed to encourage truth-telling in testimony. Hearsay is in part deemed unreliable for lack of such an appearance. Claimant’s appearance before the congressional subcommittee in this case was comparably solemn and formal.
The absence of opportunity to probe testimony by cross-examination is another of the groimds for hearsay’s presumed unreliability. The transcript of testimony itself, however, offers some assurances that diaries once existed and that the list was in fact based on them.
Claimant testified that he 'had prepared the list of his overtime hours from his diaries and that the list and the diaries were then in the possession of the subcommittee or of the Representative who had the bill under consideration. He submitted the diaries as proof of the accuracy of the list, without fear that close scrutiny or cross-examination would uncover an error. It therefore appears that the diaries were once in existence, were the source of the data on the list, and, as claimant’s wife testified, that they are now lost. It is of course possible that in the keeping of the diaries, claimant was influenced to a degree by a motive to exaggerate (cf. Palmer v. Hoffman, 318 U.S. 109 (1943)) or tended to exaggerate his overtime by reason of ignorance of what makes overtime compensable. See Anderson v. United States, supra, 136 Ct. Cl. at 367. But the fact remains that the list is traceable to lost diaries, and that the keeper of the diaries was too ill at time of trial to testify and is now dead. There is no other source of evidence of the number of hours of overtime he worked. The list is the best and the only evidence available, and it may be admitted as having the assurance of trustworthiness that it was once presented as true, by claimant, to a committee of the Congress, with the diaries to support it.
It is thus established, by the list with the aid of the transcript, that following the effective date of the Pay Act of 1945 Mr. McQuown worked 4,095% hours of overtime. For this amount of work, the proper compensation under the applicable formulae, were the claim now to be recognized and paid, is $7,891.44, not the $7,278.31 claimed in the peti *873 tion. The details of the computation are fully stated in the accompanying findings.

The Bar of the Statute of Limitations

Mr. McQuown retired from Government employment in 1955, possessed of a valid legal claim for overtime under the Pay Act of 1945. The Senate bill and resolution and the petition in this court which followed are all dated in 1970. Claimant is seeking compensation for overtime work performed between 1945 and 1955, 15 to 25 years before the beginning of this proceeding. There can be no doubt but that his claim has long been barred by the six-year statute of limitations in 28 U.S.C. § 2501 (1970), applicable to money claims against the Government in this or other courts. Section 2501 provides that: “Every claim of which the Court of Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.”
Claimant’s rights to recovery having been created by statute, and there being no available administrative procedure for the making of a formal demand for overtime pay, there was no condition precedent to his bringing an action for compensation.
Limitations begin to run when all the events fixing the defendant’s liability have occurred. Cannon v. United States, 137 Ct. Cl. 104, 107, 146 F. Supp. 827, 829 (1956); Acme Process Equipment Co. v. United States, 171 Ct. Cl. 324, 372, n. 43, 347 F. 2d 509, 538, n. 43 (1965), rev'd on other grounds 385 U.S. 138 (1966). The present claim is of the kind known as a continuing claim on multiple causes of action, each claim arising at the time of a failure to make the payment alleged to be due. In such cases, each successive failure to pay creates a new cause of action. Burich v. United States, 177 Ct. Cl. 139, 366 F. 2d 984 (1966), cert. denied, 389 U.S. 885, 998 (1967); Friedman v. United States, 159 Ct. Cl. 1, 310 F. 2d 381 (1962), cert. denied, sub nom., Lipp v. United States, 373 U.S. 932 (1963). A cause of action for overtime pay accrued each time the claimant worked overtime, or at least at the end of each pay period, when the Government failed to compensate him for his overtime work.
Mr. McQuown’s administrative claim in 1958 to the General Accounting Office was a permissive remedy which did not *874 toll the statute -of limitations. Burich v. United States, supra, 177 Ct. Cl. at 143, 366 F. 2d at 987. His last cause of action, therefore, accrued in June or July of 1955, at the time lie received bis last salary check, and was barred by limitations in mid-1961. Group v. United States, 165 Ct. Cl. 612 (1964). The statute of limitations is jurisdictional in claims against the United States. See West Publishing Co. Employees’ Preferred Stock Assn. v. United States, 198 Ct. Cl. 668, 674-75 (1972). After 1961, no court could consider the present claim.

The Case for a Removal of the Bar of Limitations

The next order of business is an inquiry into the reasons for and the excusability of claimant’s delay in bringing suit. The trial commissioner is by section 2509(c) of title 28 required to report the “facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy.”
Recommendations that the bar of limitations be waived and claimant excused for his delay in bringing suit have been made, under former 28 U.S.C. § 257 (1940) by the court and present § 2509(c) by the commissioners, only where good cause appeared. Good cause has been found “where the Government’s administrative consideration of the claim was slipshod and desultory, thereby contributing to the delay which caused the damage; where the claimant has relied on Government advice to his detriment; where he was not sleeping on his rights because justifiably relying on others; where the Government has been unjustly enriched; and where the failure to proceed in timely fashion was the result of incapacity” (citations omitted). M. T. Bennett, Private Claims and Congressional References, H. Comm. Print, 90th Cong., 2d Sess. 10 (1968). Mr. McQuown has no such excuse — no grounds for a recommendation that limitations be waived and his delay excused.
He made no claim prior to his retirement in 1955 because he felt that it would do no good and might even endanger his job at a time when he was nearing retirement.
Following his retirement in 1955, on which, by his own views, he became free to sue, he attended law school, from *875 1955 to 1958. Thereafter, in December 1958, he made an administrative claim to the General Accounting Office. When the claim was denied,[6] in January 1959, he apparently devoted all of his further efforts to possible relief in Congress. Two years later, in February 1961, there was introduced in the 87th Congress the first of a series of bills on behalf of Mr. McQuown. Successor bills were introduced in each Congress thereafter until the bill and resolution in the 91st Congress in 1970 led to the instant proceeding.
In 1962, in his testimony on one of these bills before a subcommittee of the House Committee on the Judiciary, claimant acknowledged specific awareness of this court’s decision in 1956 of Anderson v. United States, supra, in which a claim similar to his was made successfully. He further testified that he knew of a suit for overtime pay, pending at that time, brought by 80 former and then employed investigators of his own organization, the Alcohol and Tobacco Tax Division investigators. Asked whether he was one of the plaintiffs in that suit, he said: “No, sir, I am not. I didn’t want to spend any money to collect an honest debt.” His wife, testifying in the present proceeding, said that he was very patriotic and “did not think that it was necessary to sue his country for a just debt for hours that he worked.” These explanations simply do not constitute a valid excuse for the failure of one as knowledgeable as Mr. McQuown to bring suit after it had become unmistakably clear to him that his claim would not be redressed administratively.
Whether or not ignorance of one’s rights may excuse lack of diligence, where the claimant is fully cognizant of his rights, a complete lack of diligence when there is no obstacle to suit is not excusable. Mr. McQuown’s nondiligence did not take the form of mere passive delay. It apparently resulted instead from a fixed determination not to bring suit. He brought the instant suit in 1970 only when he was required to do so in order to obtain further congressional consideration of his claim.
*876 The policies underlying statutes of limitations are fully applicable to such a case as this. Statutes of limitations were originally grounded on the belief that valid claims are not neglected, that a claim brought after a long delay never was or is no longer meritorious. “The statute of limitations is established to prevent the prosecution of stale claims when the opposing party may not be able to properly contest them on account of lapse of time.” Dawnic Steamship Corp. v. United States, 90 Ct. Cl. 537, 579 (1940). Statutes of limitation are now regarded as statutes of repose, whose object it is to suppress fraudulent and stale claims from springing up to the surprise of the parties, when the evidence has been lost and the facts have become obscure from the lapse of time and the defective memory, death or removal of witnesses. Such statutes apply with full force to the most meritorious claims. 53 C.J.S. Limitations of Actions § 1 (1948).
The evidence in the present record suggests no exculpatory rationale or reasonable justification for the extraordinary action of nullifying the bar of limitations.
It is therefore recommended that Carleton R. McQuown and his executrix on behalf of his estate have neither a legal claim free of the bar of the statute of limitations nor an equitable claim in that no good cause has been shown why the bar of the statute of limitations should be removed. The claim is one for a gratuity. It is further recommended that S. 1418 not be enacted, and that Congress not grant any relief on the claim therein made.
Findings of Fact
1. S. 1418, 91st Cong., 1st Sess. (1969) a bill for the relief of Carleton R. McQuown, provided that he be paid $7,278.31 as compensation for overtime work as an investigator for the Alcohol and Tobacco Tax Unit of the Treasury, performed from July 1, 1945, through June 30, 1955, as follows:
That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Carleton R. McQuown, of Decatur, Georgia, the sum of $7,278.31, in full satisfaction of all his claims against the United States for compensation for overtime work performed by the said Carleton E. McQuown while employed as an investí- *877 gator by the Alcohol and Tobacco Tax Unit, Department of the Treasury, during the period from July 1, 1945, through June 30, 1955 * * *.
2. Senate Resolution 193, 91st Cong., 2d Sess. (1970) referred the claim of Carleton R. McQuown, as described in S. 1418, to the Chief Commissioner of the Court of Claims for a report to the Senate pursuant to 28 U.S.C. §§ 1492 and 2509, as follows:
Resolved, That the bill (S. 1418) entitled “A bill for the relief of Carleton R. McQuown,” now pending in the Senate, together with all the accompanying papers, is hereby referred to the Chief Commissioner of the Court of Claims; and the Chief Commissioner of the Court of Claims shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28, United States Code, and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant.
3. Characterizing claimant McQuown’s overtime work as “undisputed,” and also referring to adverse action on the claim in three previous sessions of Congress, Senate Report No. 91-974, 91st Cong., 2d Sess. (1970), from the Committee on the Judiciary, accompanying S. Res. 193 (preceding finding) , stated the purpose of the Resolution as follows:
The purpose of this resolution is to refer the bill, S. 1418, entitled “A Bill for the Relief of Carleton R. McQuown,” now pending in the Senate, together with all the accompanying papers to the Chief Commissioner of the Court of Claims, to authorize the Chief Commissioner of the Court of Claims to proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28, United States Code, and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant.
Specifically, this resolution would send to the Court of Claims the question of whether the claimant is entitled to certain compensation payments from the United *878 States for Ms undisputed overtime work wMle employed as an investigator by the Alcohol and Tobacco Tax Division, Internal Revenue Service, during the period from July 1, 1945, through June 30, 1955.
STATEMENT
Legislation authorizing Government compensation payment for the extensive overtime work of the claimant was introduced in the 87th, 88th, and 89th Congresses. In the 87th Congress a bill for relief was introduced, reported favorably by the House Judiciary Committee, and placed on the calendar. However, no floor action was taken. In the 88th Congress no action was taken on the bill. In the 89th Congress the bill was introduced again, and postponed in committee, primarily on the ground that no individual bill should be passed to compensate for overtime services until a “comprehensive study” of the matter were made.
Because of the difficulty involved in reintroducing this legislation in the House due to the adverse action in previous Congresses, and especially in view of the recent “study” by the U.S. Court of Claims,[1] a bill with an accompanying resolution referring the case to the Chief Commissioner of the Court of Claims was introduced in the Senate in the 90th Congress so that a report might be compiled on the merits. No action was taken by the Senate.
This bill and resolution are identical to those introduced in the 90th Congress.
4. Following the reference of S. 1418 to the Chief Commissioner, claimant McQuown on August 25, 1970, filed a petition with the clerk of tHs court alleging that from July 1, 1945, to June 30, 1955, he worked 4,092)4 hours of overtime, as an investigator in Georgia for the Alcohol and Tobacco Tax Division of the Internal Revenue Service, entitling him to $7,278.31 overtime compensation under the Federal Employees Pay Act of 1945, ch. 212, 59 Stat. 295, 5 U.S.C. § 901 et seg. (1952 ed.) (now amended and recodified in 5 U.S.C. § 5541 et seg. (1970)), and that this work was compelled and involuntary, he having been induced to so work in jeopardy of being fired if he refused.
*879 The defendant United States on October 26,1970, filed its answer denying claimant’s right to recovery and raising as affirmative defenses the statute of limitations (28 U.S.C. § 2501 (1970)) and laches.
5. (a) Trial was initially set for June 8, 1971, in Washington, D.C., formal pretrial submissions being considered unnecessary. Thereafter on request due to Mr. McQuown’s health, trial was reset at his home, Greenwood, South Carolina, on July 19, 1971, and held on that day.
(b) Claimant was present at the trial but was unable to testify because of mental and physical impairment caused by a recent stroke. Testimony on his behalf was given by his wife, Neva Vera Barnes McQuown, and by a former colleague, Thomas A'. Pruett.
(o) By stipulation filed July 16, 1971, and by agreement during a pretrial conference held on the day of trial, the parties stipulated to the admissibility of 26 exhibits. Two of these (nos. 19 and 25) were admitted on a restricted basis. Exhibit 19 is an affidavit by Louis Howell and exhibit 25 is a statement by W. Knox Johnston. The Johnston statement has not been relied upon in these findings. The parties agreed that if Howell did not testify, his affidavit could be used for all purposes. He did not testify and his affidavit has been relied upon for formal facts as to the Atlanta District and Begion of the Alcohol and Tobacco Tax Division.
(d) At the trial claimant offered in evidence two additional exhibits. One, marked plaintiff’s exhibit 27, is a transcript of testimony given by claimant and another witness before a subcommittee of the House Committee on the Judiciary in connection with a bill in the 87th Congress for the relief of claimant and others. The second, marked plaintiff’s exhibit 28, is a detailed schedule of the hours of overtime allegedly performed by Mr. McQuown, which his wife testified was compiled by claimant from diaries which are no longer in existence and were kept contemporaneously with the performance of the overtime during the period in question. These exhibits were tentatively admitted, over objection. On further consideration their admission is confirmed for reasons stated in the accompanying opinion, though it is recognized that both are hearsay.
*880 (0) Soon after trial, on July 30, 1971, claimant died testate, having designated as his executrix his wife, Neva Vera Barnes McQnown. On August 30, 1971, a motion on behalf of claimant was granted, substituting, as claimant, Mrs. Mc-Quown, as executrix.
(f) Following the filing of the transcript, an order formally closing proof was filed, on September 1, 1971.
(g) Briefs were thereafter filed, claimant’s reply brief being filed on November 19, 1971, on which date the case became ready to report.
6. The legal basis of Mr. McQuown’s claim for overtime compensation is section 201 of the Federal Employees Pay Act of 1945, ch. 212, 59 Stat. 296, 5 U.S.C. § 911 (1952 ed.), effective July 1, 1945, (now amended and recodified as 5 U.S.C. § 5542 (1970)), which provided for compensation at specified rates for hours of employment “officially ordered and approved,” in excess of a 40-hour workweek.
7. (a) Executive Order No. 9578, 3 CFR 400, 401 (1943-48 Comp.) provided that:
(c) Heads of departments * * * may delegate to any officer or employee authority to order or approve overtime * * *. No overtime in excess of the administrative workweek shall be ordered or approved except in writing by an officer or employee to whom such authority has been specifically delegated * * *.
(b) 5 CFR 25.141(c) (1949 ed.), the applicable regulation, stated:
(c) Heads of departments * * * may delegate to any officer or employee authority to order or approve overtime in excess of any that may be included in the regularly scheduled administrative workweek. No such excess overtime shall be ordered or approved except in writing * * *.
8. (a) Claimant was appointed as a prohibition agent with the then Bureau of Prohibition in 1930. Thereafter, he was transferred to the Alcohol and Tobacco Tax Division (now the Alcohol, Tobacco and Firearms Division), Internal Revenue Service, Department of the Treasury, where he served during different periods as an investigator in the Atlanta District (now Region) until he retired on June 30, 1955. His total service at his retirement on June 30, 1955, was 25 consecutive years.
*881 (b) He worked as a Special Investigator GS-8 (equivalent) from July 1, 1945, until May 15, 1948; as a Criminal Investigator GS-8 (equivalent) (a position also referred to as “Investigator”) from May 16, 1948, until September 4, 1949; and again as a Special Investigator GS-9 (and equivalent) from September 4, 1949, until Ms retirement on June 30, 1955.
(c) Special Investigators were under tlie direct supervision of the aide to the CMef, Enforcement Branch, Atlanta District (Region). Criminal Investigators were under the direct supervision of a Supervisor-in-Charge.
(d) Special Investigators were frequently engaged in mul-tistate operations involving major matters, and were subject to assignment anywhere within the five-state District (or seven-state Region). Criminal Investigators worked solely in the state to which they were permanently assigned.
9. (a) The duties of criminal investigators and special investigators consisted of the detection and apprehension of violators of the statutes enforced by the Alcohol and Tobacco Tax Division. Such violators were mainly operators of illegal stills (“moonshiners”). Investigators normally conducted independent investigations of illegal activities. The work involved surveillances, seizures, raids, and arrests.
(b) The duties of investigators and special investigators were such that the work could frequently not be accomplished within the normal workday or week. Overtime work was necessary to complete investigations satisfactorily. As one witness put it, the investigators worked when the violators worked.
(c) During the period in question, the investigators in the Atlanta District (Region), including claimant, performed considerable overtime work. In the course of this work, claimant was frequently absent from his home on nights, weekends and holidays.
10. The Assistant Commissioner of Internal Revenue made a study of overtime in connection with the provisions in the Federal Employees Pay Act Amendments of 1954 for premium pay for overtime work (ch. 1208, sec. 208, 68 Stat. 1111).
The report of the study, dated October 22, 1954, stated in part:
*882 The only positions in the Atlanta Region which appear to meet the condition that the hours of duty cannot be controlled administratively, as explained in your memorandum, are in the Alcohol and Tobacco Tax Division. * * *
Hi * * * *
1.The following positions currently exist for which hours of duty cannot be controlled administratively.
Title Grade
Special Investigators. GS-9
Investigators-. GS-9
Investigators. GS-8
2. The definition of “Hours of duty cannot be administratively controlled” applies to each and every incumbent of the above listed positions.
3. (a) The following is a list showing the average number of hours of overtime work that each grade m each position performed during the week. There is no appreciable seasonal variation.
Position Grade Average No. of Hrs. per Week
Special Investigators.. GS-9 18.99
Investigators.....GS-9 11.14
Investigators.. — -- GS-8 13.37
(c) The specific nature of the duties of these positions which require the incumbent to remain on duty is Federal Law Enforcement. The Investigators and Special Investigators are called at all times during the day and night, including week-ends and holidays, to apprehend persons engaged in the violation of the Internal Revenue Liquor Laws. Failure to answer these calls and to assist in the apprehension of violators and in the suppression in (sic) tiie illicit liquor traffic would be considered as negligence of duty. * * *
4.The data on hours of overtime duty as shown in paragraph 3(a) above were obtained from records of overtime work performed maintained in the office of the Assistant Regional Commissioner, and cover the months of May, June, and July, 1954. These records are *883 compiled from daily and monthly production reports of Investigators and Special Investigators. * * *
11. No concept of overtime compensation existed in the Atlanta District (Region) during the period in question and there were no administrative procedures by which investigators could make application for compensation for overtime worked. Claimant’s supervisors were, during the entire period, generally aware of the Federal Employees Pay Act of 1945, and they were aware that most or all of the investigators in the District (Region), himself included, were performing substantial amounts of overtime. They made no effort, however, to translate the Pay Act of 1945 into a reality for the investigators or to provide any form of compensation for the investigators for overtime.
12. (a) Claimant did not, from July 1, 1945, the effective date of the Federal Employees Pay Act of 1945, until his retirement on June 30, 1955, receive any payment in addition to his basic salary as compensation for overtime worked.
(b) He was never officially or otherwise informed that he should not work overtime because no compensation would be paid for overtime worked.
(c) He did not refuse to work overtime, or formally request overtime pay. He believed that had he done so, he would have jeopardized his job at a time when he was close to retirement age.
(d) He did not receive compensatory time for overtime worked except on possibly one or two occasions. It was not the policy of the Atlanta District (Region) to grant compensatory time for overtime worked.
13. The evidence establishes that overtime was necessary, satisfactorily to complete investigation directed to be performed; that failure to work the overtime required to perform investigations would be considered neglect of duty; that if investigators failed to work sufficient overtime, satisfactorily to complete their investigations, they could not maintain high efficiency ratings; that failure to maintain high efficiency ratings could lead to termination of employment; and that investigators were subject to termination of employment for failure to do as directed. Accordingly, while *884 tbe work performed by the claimant in excess of 8 hours per day and 40 hours per week was not expressly ordered, it was exacted from him, with the knowledge of senior supervisory officers of all the circumstances, as a condition of his continued employment, and was therefore not voluntarily rendered, but rather induced and coerced, involuntarily. It was thus in effect, officially ordered and approved by the agency as a whole.
14. (a) As noted in the last paragraph of the study quoted in finding 10, investigators in the Atlanta District (Region), including claimant, were required to prepare and submit daily reports of their activities. Special investigators submitted their reports to the aide to the chief; investigators submitted their reports to the supervisor-in-charge.
(b) The overtime hours worked appeared from these reports, in the total hours worked; they were not separately noted. The respective supervisors reviewed the reports in order to review the activities of the investigators, and not for the purpose of recording overtime hours.
(c) The daily reports were maintained in the District (Regional) office for 2 years, then forwarded to a records center. All of these reports from the Atlanta District (Region) for the period in question, including those submitted by claimant, were destroyed no later than January 26, 1962, pursuant to a prescribed destruction schedule.
(d) The reports submitted by claimant, now destroyed, were the only official documents in which were recorded the hours of overtime worked by claimant.
15. (a) Exhibit 28 introduced in evidence on claimant’s behalf is a 84-page schedule, undated and unsigned, purporting to be a complete record of the overtime work performed by him during the period in question. It is claimed that the schedule is a list of every date during the 11 years in which he had worked overtime, and that beside each date is noted the exact number of hours of overtime performed by claimant on that date. The total of the hours so scheduled is 4,095% (not 4,092*4 as stated in the petition).
(b) Claimant’s widow testified that her husband had prepared the list some time subsequent to his retirement, and that he had derived the data recorded from a diary which *885 he maintained while he was employed. On each occasion her husband worked overtime, the witness testified, he made a diary entry of the date and number of overtime hours worked; and that he kept the diary to aid him in preparing his daily reports. She further testified that the diaries were lost during a household move some years prior to the filing of the petition in this proceeding.
This testimony is essentially the same as claimant’s testimony before a subcommittee of the House Committee on the Judiciary, on May 23, 1962, which considered one of the predecessors of the bill presently under consideration. The transcript of this testimony is exhibit 27.
(c) In the course of his testimony before the subcommittee, claimant stated that his dollar claim had been computed on the basis of hours he had worked overtime, multiplied by a figure used by the Treasury for overtime compensation; that he had compiled from his diaries, a list of the hours he had worked overtime each day, and that the list (present exhibit 28) was part of the file with the subcommittee and that the diaries were with the subcommittee or with the Representative who had introduced the bill.
(d) Defendant objected to the admissibility of the list in the instant proceeding on the ground that the data it records is unsupported and unverifiable by any extrinsic evidence. The list was tentatively admitted, as exhibit 28, subject to further objection in defendant’s brief. Such further objection has been made.
(e) It has been concluded as a matter of law, for reasons stated in the opinion, that the list contained in exhibit 28, though hearsay, is sufficiently reliable in the circumstances to base a conclusion as to the number of hours of overtime which claimant worked between 1945 and 1955. These circumstances include the presentation of the list by Mr. McQuown to a subcommittee of the Committee on the Judiciary in 1962, its description in claimant’s testimony at that time, the physical proffer of the list and the diaries at that time, and Mrs. McQuown’s testimony in the present proceeding.
(f) It is found, in accordance with exhibit 28, that claimant worked the following number of overtime hours from the *886 effective date of the Pay Act of 1945 to his retirement in 1955:
Year: Overtime Hours
1945 889%
1946 . 722
1947 . 610½
1948 . 537
1949 475%
1950 . 308%
Year: Overtone Hours
1951 . 160%
1952 . 150%
1953 . 220%
1954 . 383%
1955 . 138
Total_4,095¾
16. (a) The need for overtime in the work of criminal investigators and special investigators did not change materially over the 10 years preceding the Assistant Commissioner’s 1954 estimates (finding 10, supra) of the average number of hours of overtime worked, weekly, by those officers, and therefore his estimates of overtime hours worked may be taken as applicable to the entire period 1945-1955.
(b) There is no reason to suppose that the Assistant Commissioner’s estimates of overtime included noncompensable travel time or other overtime not compensable under law and regulations. His memorandum was a part of a study of the applicability to Internal Eevenue employees of the premium provisions of the Pay Act Amendments of 1954, which act excluded hours of travel time from compensable overtime, unless work was actually performed during the travel or the travel was arduous (sec. 205(b), 68 Stat. 1110, 5 U.S.C. § 912(b) (Supp. II, 1952 ed.)) and his memorandum would not have been useful had it included within the estimates noncompensable items such as travel time.
(c) The average number of hours of overtime per week stated by the Assistant Commissioner (finding 10, supra)— 18.99 hours for GS-9 special investigators and 13.37 hours for GS-8 investigators — may therefore be taken as reliable estimates of the weekly hours of overtime by investigators performing the same work as claimant during the periods when claimant held those positions and grades.
17. (a.) The number of overtime hours worked by claimant during the periods he held his successive positions (according to the schedule of overtime hours worked by him, exhibit 28) as compared to the number of hours worked by the *887 average investigator (rounded off from 13.37 to 13.5) and by the average special investigator (rounded off from 18.99 to 19) is as follows:
Periods Overtime Overtime Honrs Worked By Worked Average Investigator
7-1-46 to 10-6-46. Special Investigator 253% 189
$3,640 per annum 10-7-46 to 6-30-46. 441%
Special Investigator $3,760 per annum 7-1-46 to 10-19-46. 28814 216
Special Investigator $4,276 per annum 10-20-46 to 11-1-47. 67814 729
Special Investigator $4,400.40 per annum 11-2-47 to 6-16-48. 268 378
Special Investigator $4,625.80 per annum 6-16-48 to 7-10-48. 12014 96
Criminal Investigator $4,626.80 per annum 7-11-48 to 9-3-49. 619% 810
Criminal Investigator $4,855.80 per annum 9-4-49 to 10-29-49.-86 162
Special Investigator $4,981.20 per annum 10-30-49 to 9-2-60. 311 836
Special Investigator $6,100 per annum 9-3-60 to 7-7-61. 168 836
Special Investigator $6,225 per annum 7-8-61 to 9-1-51.. 2314 162
Special Investigator $6,686 per annum 9-2-51 to 10-30-54. 718 3,164
Special Investigator $5,810 per annum
10-31-54 to 6-30-56. Special Investigator $6,810 per annum 220 646
Totals.. 4,096M 8,707
(b) The disparity between the total of 8,707 overtime hours worked by the average investigator and the 4,095% hours worked by claimant may be explained by claimant’s increasing age. He became 60 years old in 1948, and pre *888 sumably less able to carry a heavy load of overtime. It appears from the above table that the number of hours worked by him in the years 1945-1948 corresponds closely with the number worked by the average investigator; thereafter claimant’s hours dropped sharply relative to those of the average investigator.
18. (a) From July 1, 1945 to October 3:1, 1954, overtime pay rates for federal employees earning more than $2,980 per year (basic rate of pay) were computed in the following manner:
[T]he overtime rate for 416 overtime hours for any basic rate of compensation in excess of $2,980 per annum is computed by subtracting from $894,7.6782 per centum of the amount by which such basic rate is in excess of $2,980 per annum; with the condition that the rate for 416 overtime hours for all salaries of $6,440 or more shall be $628,334.
10 Fed. Reg. 8194 (1945) [Ex. 2 herein] ; 5 C.F.R. § 25.143 (b) (1949); 15 Fed. Reg. 1235, 1295 (1950); 15 Fed. Reg. 5492, 5494 (1950).
(b) From October 31, 1954 to June 30, 1955, overtime pay rates for federal employees whose annual compensation (basic rate of pay) exceeded the minimum scheduled rate of pay for the Grade GS-9 was computed as follows (19 Fed. Reg. 7099 (1954)):
(b) For each officer or employee whose basic compensation is at a rate which exceeds the minimum scheduled rate of Grade GS-9 of the Classification Act of 1949, as amended, the overtime hourly rate shah, be one and one-half times the hourly rate of basic compensation at the minimum scheduled rate of grade GS-9.
During the period, the minimum scheduled rate of pay for Grade GS-9 was $5,060 per year. Act of October 24, 1951, ch. 554, 65 Stat. 612. This represents an hourly rate of pay (computed by dividing $5,060 by 2,080) of $2.43. The overtime rate, iy2 times the hourly rate of $2.43, is $3.65 per hour.
19. Utilizing the formulae stated in the preceding finding, overtime worked by claimant during the periods in question would, if now payable, be compensable at the following rates, to the totals in the last column:
*889 Claimant’s Overtime Dollar
Dates Annual Rate Per Compensa-
Salary unit, 416 tion
Hours
7-1-45 to 10-6-46.— $3,640.00 $843,324 $514.41
10-7-45 to 6-30-46,. 3,750.00 834.878 886.05
7-1-46 to 10-19-46. 4,275.00 794 667 551.04
10-20-46 to 11-1-47. 4,400.40 784.939 1,279.77
11-2-47 to 5-15-48. 4,626.80 776.310 499.48
6-16-48 to 7-10-48. 4 625.80 775.310 224.58
7-11-48 to 9-3-49. 4,855.80 749.972 937.01
9-4.49 to 10-29-49.-. 4,981.20 740.344 161.27
10-30-49 to 9-2-50. 6,100.00 731.222 646.66
9-3-50 to 7-7-61.... 6,225.00 721.624 291.43
7-8-61 to 9-1-51. 6,686.00 686.305 38.77
9-2-51 to 10-30-54. 6,810.00 676.707 1,167.97
Rate Per Hour of Overtime
10-31-54 to 6-30-55_.-.. 6,810.00 3.65 803.00
$7,891.44
20. The foregoing total amount of $7,891.44 overtime compensation is greater by more than $600 than the compensation of $7,278.81 appearing in the text of S. 1418 and prayed for in the petition in this court. Although there is no evidence on this point, it appears that the total of $7,278.31 in the petition was computed on the basis of tables of overtime rates enacted as part of the Pay Act of 1945. See 5 U.S.C. § 911 (1952 ed.). While these rates were valid in the period immediately following the initial enactment of the Pay Act of 1945, the tables were revised at various intervals to conform more closely to the basic pay rates of federal employees as those pay rates were from time to time amended. The method of computing rates of overtime pay at any given time during the period in question, and the correct total, are given in foregoing findings 18 and 19.
21. Following his retirement on June 30, 1955, claimant attended law school, from 1955 to 1958. He took no action towards obtaining compensation until 1958.
22. On October 18,1958, claimant submitted a claim to the General Accounting Office for overtime compensation for the period in question, July 1,1945 to June 30,1955, on the basis of the Federal Employees Pay Act of 1945, together with a list of the days, and hours on each day, he claimed to have *890 worked overtime, doubtless the list which is exhibit 28 in this proceeding.
The letter stated in part:
This Act provided for overtime in excess of 40 hours a week, we were to be granted compensatory time for all overtime worked if it could be so arranged, a few men were allowed compensatory, I believe if I am not mistaken I was allowed compensatory time for one or two occasions, I was then told that our work which could not be terminated at the end of an 8 hour period and that it meant a 24 hour on duty proposition and that we were not to [be] considered as covered by the Act referred to aboye, I protested this but as I was not ready to quit the service I was prevented from taking an[y] further action at the time and I worked hours as set forth in the attached listed dates and years.
The Act sets out that those who are authorized and those whose work is approved are to be considered as ones who should be allowed the overtime.
I was authorized as you will see in the preceding paragraph, my reports which I submitted were APPROVED, and my request for compensatory time was denied, under these circumstances I cannot see where I am not entitled to pay for hours worked.
There has been a continuity in the service rendered and each date I worked carried on the burden of the money due, therefore it would appear that the entire amount of hours worked are a continuing debt on the part of the United States renewing itself to the last date claimed.
I have and can produce records which I have kept barring a few days which I do not have of all of the overtime worked, these records were made contemporaneous and each day as they were worked, I can swear as to the correctness of the account if such affidavit is necessary I will gladly produce same.
The records of the Internal Revenue Service will and can corroborate all the facts as I have set them forth in this claim.
23. The claim was disallowed, in a General Accounting Office settlement certificate dated December 12,1958, for the reasons stated in the following excerpt from the certificate:
Your claim was filed in the General Accounting Office October 20, 1958. The act of October 9, 1940, 54 Stat. 1061, expressly bars any claim cognizable by the General Accounting Office not received in this Office within *891 the ten-year period after the date such claim first accrues. Accordingly, that part of your claim prior to October 20,1948, is barred.
The Civil Service Commission issued a regulation (5 OFR, sec. 25.141 (c)), under the Federal Employees Pay Act of 1945 which provided in part:
“* * * No such excess overtime shall be ordered or approved except in writing by an officer or employee to whom such authority has been specifically delegated by the head of the department or independent establishment or agency * *
It is reported by the Office of the Commissioner of Internal Revenue, that the overtime services listed in your claim appear to have been taken from the daily reports you were required to submit for the purpose of showing the duties performed and the hours worked; that such reports were in no way intended or considered as authority for the performance of overtime services, and that the overtime duty was neither ordered nor scheduled by an officer delegated to authorize overtime duty and therefore not approved.
Therefore, since the overtime services allegedly performed were not ordered or approved, there is no authority for the payment thereof.
24. Claimant filed a request for reconsideration in which he referred to the justice, merit and provable nature of his claim, and asked for reconsideration “as I do not like to place the matter in the hands of an attorney for collection”:
I wish to take issue with the Commissioner of Internal Revenue, and I did not take this overtime from any daily report.
This overtime was taken from a contemporaneous memorandum which I made each day that I worked.
I further know that this overtime was ordered and that it was approved. I further know that a summary of all the overtime worked by each employee was made by the District office of the Internal Revenue and that the same was submitted each month to the office in Washington.
In view of the fact that the law of 1945 specifically set forth that any time worked beyond 40 hours a week was compensable it would have been the height of foolishness for men to donate hours after hour on [sic] work which they knew was not required of them.
I therefore respectfully ask that this matter be further gone into as I do not iike to place the matter in the hands of an attorney for collection. I have been reliably *892 informed that this is a just claim and that in view that I have my contemporaneous memorandum and that I personally have seen the officer in charge here approve the time worked and that I know and can prove that the overtime summary was made up and furnished that this claim is valid and should be paid.
25. The General Accounting Office denied reconsideration on January 16, 1959. Citing the applicable statute and regulations governing overtime, the GAO stated in part:
Prior to the release of the above-mentioned settlement [denying claimant’s initial claim letter] we received a report from the administrative office reading, in part, as follows:
“The Assistant Regional Commissioner, Alcohol and Tobacco Tax, Atlanta Region, advises that the overtime duty claimed was neither ordered nor scheduled by an officer designated to authorize overtime duty. The reports referred to in the claim as having been approved were apparently the claimant’s daily reports. Investigators are required by the Alcohol and Tobacco Tax activity to submit daily reports showing duties performed and hours worked. After approval, each report is sent to the headquarters office to show that the investigator had worked and should be paid for that day. The Internal Revenue Service does not intend or consider such reports as authority or as records relative to the performance of overtime services officially ordered or approved. The United States Court of Claims supported this principle in a decision dated February 5, 1952, by determining that the approval of such daily reporte by Investigators in Charge did not constitute the statutory ‘ordered and approved’ requirement for the payment of overtime compensation.”
The General Accounting Office 'has no authority to waive the provisions of a statute, or to disregard valid and binding regulations promulgated in compliance therewith. The well established rule of accounting officers concerning disputed questions of fact between a claimant and the administrative officers of the Government, is to accent the statement of facts as administratively reported in the absence of evidence sufficient to overcome the presumption of the correctness thereof. No such evidence has been presented. In the light of the reported facts and circumstances, the settlement of December 12,1958, disallowing your claim must be and is sustained.
*893 26. (a) Two years later, on February 27,1961, Congressman James C. Davis of Georgia introduced H.R. 4950, 87th Cong., 1st Sess. (1961) for the relief of Mr. McQuown and others similarly situated, providing for the payment of their overtime claims for the period in question. The bill was referred to the Committee on the Judiciary. 107 Cong. Rec. 2742 (1961). On May 23, 1962, a subcommittee of the House Committee on the Judiciary held a hearing on this bill, at which claimant testified. (The transcript is exhibit 27 herein.) On June 19, 1962, the bill was favorably reported, H.R. Rep. No. 1844, 87th Cong., 2d Sess. (1962). 108 Cong. Rec. 11006 (1962). Thereafter, the bill was passed over by the House seven times without prejudice. 108 Cong. Rec. 12525, 13770, 15804, 16985, 18418, 19694, 21734 (1962). Objection was made to the ‘bill and to similar private bills on the ground that Congress should establish a uniform policy regarding overtime claims arising under the Pay Act of 1945.108 Cong. Rec. 15804 (1962).
(b) On March 18,1963, Congressman Weltner of Georgia introduced H.R. 4986, 88th Cong., 1st Sess. (1963) for the relief of Mr. McQuown and others. The bill was referred to the Committee on the Judiciary, and no further action was taken. 109 Cong. Rec. 4457 (1963).
(c) On March 10, 1965, Congressman MacKay of Georgia introduced H.R. 6108, 89th Cong., 1st Sess. (1965) for the relief of Mr. McQuown and others. The bill was referred to the Committee on the Judiciary, and no further action was taken. 111 Cong. Rec. 4756 (1965).
(d) On March 14, 1968, Senator Scott of Pennsylvania introduced S. 3162, 90th Cong., 2d Sess. (1968), and S. Res. 264, 90th Cong., 2d Sess. (1968). The bill and resolution provided — as do the bill and resolution which are the subject of the instant proceeding — for the relief of claimant and the reference of the case to the Chief Commissioner of the Court of Claims. The bill and resolution were referred to the Committee on the Judiciary (114 Cong. Rec. 6516, 6519 (1968)) and no further action was taken.
(e) On March 7, 1969, Senator Scott introduced S. 1418, 91st Cong., 1st Sess. (1969) (text set out in finding 1, supra) for the relief of claimant; and on May 1,1969, Senator Scott introduced S. Res. 193, 91st Cong., 1st Sess. (1969) (text set *894 out in finding 2, supra). The documents were identical with the corresponding bill and resolution introduced in the prior Congress. 115 Cong. Rec. 5502, 11084 (1969); preceding sub-paragraph (d). On June 25, 1970, S. Res. 193 was favorably-reported from the Committee on the Judiciary together with S. Rep. No. 91-974, 91st Cong., 2d Sess. (1970), quoted in finding 3, supra. 116 Cong. Rec. 21369 (1970). On June 26, 1970, S. Res. 193 was agreed to by the Senate without objection, and S. 1418 was referred to the Chief Commissioner of the Court of Claims, initiating the instant proceeding. 116 Cong. Rec. 21704 (1970).
27. Claimant did not at any time subsequent to his retirement on June 30, 1955, bring suit to recover overtime compensation until, following the reference of his claim by the Senate to the Chief Commissioner on June 26, 1970, he filed his petition in this court on August 25, 1970. He first presented his claim to the General Accounting Office on October 18, 1958 (finding 22, supra), more than 3 years following his retirement. The first congressional action on his behalf — the introduction of H.R. 4950 — took place on February 27, 1961 (preceding finding), more than 5 years following his retirement. The Senate resolution of June 26, 1970, referring his case here (S. Res. 193, finding 2, supra), and the subsequent filing of the petition in this court took place 15 years after he had retired on June 30, 1955, and had become free to institute suit.
28. (a) In past cases in this court, numerous federal employees, including investigators of the Alcohol and Tobacco Tax Division engaged in work similar or identical to that of claimant, have recovered judgments for overtime compensation under the terms of the Federal Employees Pay Act of 1945. In these cases, the claimants were under the applicable statute of limitations, 28 U.S.C. § 2501, limited in their recovery to compensation for work within 6 years of the date of the filing of their petitions in this court. Anderson v. United States, 136 Ct. Cl. 365 (1956); Adams v. United States, 132 Ct. Cl. 766 (1963); Byrnes v. United States, 163 Ct. Cl. 167, 324 F. 2d 966, 330 F. 2d 986 (1963).
(b) A 6-year limitations period would permit claimant to recover only for overtime pay compensation, if any, earned in the 6-year period between August 25, 1964 and August 25, *895 1970, the date of his petition in this court. Since his latest claimed overtime dates back to 1955', under such a 6-year limitations bar claimant would recover nothing.
(c) Investigators of the Alcohol and Tobacco Tax Division, Atlanta Region, in recent years have recovered on claims for overtime compensation filed with the General Accounting Office; 'but such claimants have been denied recovery for any claims accruing prior to 10 years before their claims were received by the General Accounting Office, pursuant to the 10-year statute of limitations applicable to such claims, 31 U.S.C. § 237 (1970). Under a 10-year limitations bar, claimant could recover only for any overtime pay earned in the 10 years between August 25,1960 and August 25,1970, the date of his petition in this court, and again he would recover nothing.
29. (a) In the course of his testimony on May 23, 1962 on H.R. 4950 (finding 26, supra), before Subcommittee No. 2 of the House Committee on the Judiciary, claimant cited in support of his claim the case of Anderson v. United States, supra, in which the Court of Claims had, in circumstances similar to those of the claimant, rendered judgment in favor of employees of the Bureau of Customs who were seeking overtime compensation on the basis of the Federal Employees Pay Act of 1945. Claimant acknowledged his awareness of the similarity between the Anderson claims and his own claims.
Mr. McQuown also testified that he was aware that 80 (then) present and former investigators in the Alcohol and Tobacco Tax Division were at the time plaintiffs in the Court of Claims in suits seeking overtime compensation. Asked whether he was one of those plaintiffs he said: “No, sir, I am not. I didn’t want to spend any money to collect an honest debt.”
(b) In this proceeding, claimant’s wife, testifying in explanation of claimant’s failure, following his retirement, to invoke his legal remedy of a suit for overtime pay, said that Mr. McQuown was a very patriotic person and “did not think it was necessary to sue his country for a just debt for hours that he worked.” She said that cost also entered the picture; that “we didn’t have money to hire legal people. That was not the main reason. The main reason was that Mr. McQuown *896 did not think it necessary to sue his country for a just debt.”
30. The daily reports that claimant submitted to his immediate supervisors between July 1, 1945 and June 30,1955, were destroyed, pursuant to regular destruction schedules, no later than January 26, 1962 (see findings 14 and 15, supra).
Ultimate Findinus and CONCLUSIONS
31. During the period from July 1, 1945 to June 30, 1955, when the claimant worked as an investigator for the Alcohol and Tobacco Tax Division (Atlanta District and Eegion), Bureau of Internal Eevenue, Department of the Treasury, claimant performed substantial amounts of overtime work, i.e., work in excess of the 40-hour administrative workweek.
32. He has never received any compensation in addition to his basic salary for the overtime work.
33. The overtime work by claimant was not voluntarily rendered, but rather was coerced and induced by his agency in that it was required with the knowledge and approval of superior officials authorized to approve overtime work, and was required of claimant by the agency as a condition of his continued employment. His overtime work was therefore officially ordered and approved within the meaning of the Federal Employees Pay Act of 1945, and thus compensable under that act.
34. The (corrected) total amount of overtime claimed herein, 4,095% hours, based on hearsay evidence admissible because of special circumstances assuring its reliability, is accepted as the number of compensable hours of overtime worked by claimant.
35. The compensation for 4,095% hours of overtime work, according to the rates of overtime pay in force on the dates on which the work was performed, is $7,891.44. The amount of $7,278.31 claimed by Mr. McQuown, and contemplated by the terms of S. 1418, the bill under report, is inaccurate.
36. Mr. McQuown does not have a legal claim for overtime compensation. His legal claim was barred by the statute of limitations (28 U.S.C. § 2501 (1958)) on or about June 30, 1961.
37. Prior to June 30, 1961, claimant had a complete and adequate legal remedy. He has failed to present any reason *897 able excuse or justification for Ms failure to pursue Ms legal remedy. He intentionally and advisedly failed to pursue that remedy without any reasonable excuse. He therefore does not have an equitable claim within the meaning of 28 U.S.C. § 2509(c).

 Carleton R. McQuown died testate on July 30, 1971. His widow and executrix, Neva Vera Barnes McQuown, has been duly substituted herein on claimant’s behalf.

 See Albright v. United States, 161 Ct. Cl. 356, 362-63 (1963).

 “Sec. 201. Officers and employees to whom this title applies shall, In addition to their basic compensation, he compensated for all hours of employment, officially ordered or approved, in excess of forty hours in any administrative workweek, at overtime rates as follows: * *

 Executive Order No. 9578, 3 CFR 400, 401 (1943-48 Comp.), issued following the enactment of the Pay Act of 1945, provided in part that:
“(c) Heads of departments * * * may delegate to any officer or employee authority to order or approve overtime * * *. No overtime in excess of the administrative workweek shall be ordered or approved except in writing by an officer or employee to whom such authority has been specifically delegated * *
The applicable regulation of the Civil Service Commission, 5 CFR § 25.141(c) (1949 ed.) provided:
“Heads of departments * * * may delegate to any officer or employee authority to order or approve overtime in excess of any that may be included in the regularly scheduled administrative workweek. No such excess overtime shall be ordered or approved except in writing * *

 These Rules govern this case, for Rule 133 of the rules of this court provides that evidence shall he admissible in trials In this court which is admissible under united 'States statutes or under the rules of evidence in the District Court for the District of Columbia in nonjury trials, and that the rule which favors the reception of evidence governs.

 The General Accounting Office denied the claim for oyertime between 1945 and 1948 on the ground of the 10-year statute of limitations applicable to claims before the General Accounting Office (now found in 31 U.S.C. § 237 (1970)), and the claim for 1948 to 1955 on the ground that the overtime was not officially ordered and approved.

 Tabbutt et al. v. United States, 121 Ct. Cl. 495 (1952) ; Arnvid Anderson et al. v. United States, 136 Ct. Cl. 365 (1956) ; Albright et al. v. United States, 161 Ct. Cl. 356 (1963) ; Adams et al. v. United States, 162 Ct. Cl. 766 (1963) ; Byrnes v. United States, 163 Ct. Cl. 167 (1963).